H69KDZHC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4             v.                          17 CR 350 (KBF)

5   ZURAB DZHANASHVILI, AKAKI
    UBILAVA, HAMLET UGLAVA,
6   MIKHEIL TORADZE, AVTANDIL
    KANADASHVILI, NAZO
7   GAPRINDASHVILI, ARTUR
    VINOKUROV, EVGHENI MELMAN,
8   ZURAB BUZIASHVILI, AZER
    ARSLANOUK, BAKAI MARAT-UULU,
9   ANDRIY PETRUSHYN, LEVAN
    MAKASHVILI, DENYS DAVYDOV,
10  ALEX MITSELMAKHER, YURIY
    LERNER, AVTANDIL KHURTSIDZE,
11  SEMYON SARAIDAROV,

12                  Defendants.

13  ------------------------------x

14                                       New York, N.Y.
                                         June 9, 2017
15                                       12:30 p.m.

16

    Before:
17
                        HON. KATHERINE B. FORREST,
18
                                         District Judge
19

20

21

22

23

24

25

H69KDZHC

<table>
<tr><td>1</td><td></td></tr>
</table>

APPEARANCES

JOON H. KIM,
      Acting United States Attorney for the
      Southern District of New York
ANDREW ADAMS
ANDREW MARK THOMAS
      Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK
      Attorneys for Defendant Dzhanashvili
AMY GALLICCHIO

DONNA NEWMAN
    Attorney for Defendant Ubilava

RICHARD MA
    Attorney for Defendant Uglava

BOBBI STERNHEIM
    Attorney for Defendant Toradze

DAVID GREENFIELD
    Attorney for Defendant Kanadashvili

LANCE LAZZARO
    Attorney for Defendant Gaprindashvili

GERALD DI CHIARA
    Attorney for Defendant Vinokurov

IRVING COHEN
    Attorney for Defendant Melman
BY:  DONNA NEWMAN

EVANS D. PRIESTON
    Attorney for Defendant Buziashvili

LOUIS FASULO
    Attorney for Defendant Arslanouk

JOHN WALDRON
    Attorney for Defendant Marat-Uulu
BY:  EDWARD WALDRON

ARNOLD LEVINE
    Attorney for Defendant Petrushyn

3

H69KDZHC

1                          APPEARANCES (Continued)

2    XAVIER DONALDSON
          Attorney for Defendant Makashvili
3
     SUSAN KELLMAN
4         Attorney for Defendant Davydov

5    ANDREW FRISCH
          Attorney for Defendant Mitselmakher
6
     CHARLES MILLER
7         Attorney for Defendant Lerner

8    GUY OKSENHENDLER
          Attorney for Defendant Khurtsidze
9
     LISA SCOLARI
10        Attorney for Defendant Saraidarov

11

12   ALSO PRESENT:

13   YANA AGOUREEV, Russian Interpreter
     MAYA BERIDZE, Georgian Interpreter
14   LASHA GEGECHKORI, Georgian Interpreter
     NASHAUN RICHARDS, FBI
15   ROBERT HANRATTY, FBI
     ERIN OTTERSON, FBI
16   BRUCE TURPIN, FBI
     ASHLEY COSME, Pretrial
17

18

19

20

21

22

23

24

25

H69KDZHC

| | |
|---|---|
| 1 | THE DEPUTY CLERK:  In the matter of United States of |
| 2 | America versus Zurab Dzhanashvili, 17 CR 350. |
| 3 | Please state your names for the record. |
| 4 | THE COURT:  Actually before you do, hold on one |
| 5 | moment.  I've got my seating chart, which I just want to make |
| 6 | sure I've got right in front of me. |
| 7 | Okay.  Go ahead. |
| 8 | MR. ADAMS:  Good afternoon, your Honor.  Andrew Adams |
| 9 | and Andrew Thomas, for the government.  And with us today at |
| 10 | counsel table are a number of FBI agents.  This is Nashaun |
| 11 | Richards, Robert Hanratty, Erin Otterson, and Bruce Turpin, all |
| 12 | of the New York FBI. |
| 13 | THE COURT:  All right.  In that order; am I right? |
| 14 | MR. ADAMS:  Yes, your Honor. |
| 15 | THE COURT:  Okay.  Good afternoon, all of you. |
| 16 | MR. RICHARDS:  Good afternoon, Judge. |
| 17 | THE COURT:  Let's start, Mr. Di Chiara, with you, and |
| 18 | let's work our way across the tables. |
| 19 | MR. Di CHIARRA:  Good afternoon, your Honor.  For |
| 20 | Artur Vinokurov, who is seated in the front row, second one in |
| 21 | from your Honor's, I guess -- well, furthest from your Honor, |
| 22 | the second one in. |
| 23 | THE COURT:  All right.  I think he's nodding his head |
| 24 | at me. |
| 25 | MR. Di CHIARRA:  That's right.  Thank you, Judge. |

H69KDZHC

```
 1              THE COURT:  Okay.  Thank you.

 2              MR. MA:  Good afternoon, Judge.  Richard Ma, appearing

 3    on behalf of Mr. Hamlet Uglava.  Mr. Uglava is in the second

 4    row closest to you.

 5              THE COURT:  Good afternoon, both of you.

 6              MS. GALLICCHIO:  Good afternoon, your Honor.  Federal

 7    Defenders, by Amy Gallicchio, for Mr. Dzhanashvili.  He is

 8    seated in the first row furthest from you.

 9              THE COURT:  Good afternoon.

10              MR. LEVINE:  Good afternoon, your Honor.  Arnold

11    Levine, for Andriy Petrushyn.  He's closer to you.

12              THE COURT:  All right.  Good afternoon.

13              MR. WALDRON:  Good afternoon, your Honor.  Ed Waldron,

14    for Mr. Bakai Marat-Uulu, in place of John Burke.  Mr. Uulu has

15    consented to my representation for today.  He is seated in the

16    back row and is nodding his head right now.

17              THE COURT:  All right.  Good afternoon, both of you.

18              MR. OKSENHENDLER:  Good afternoon, your Honor.  Guy

19    Oksenhendler, for Mr. Khurtsidze.  He's seated third in the

20    jury box from your left in the front row.

21              THE COURT:  Good afternoon.

22              MR. DONALDSON:  Your Honor, good afternoon.  Xavier

23    Donaldson, for Mr. Makashvili.  He is in the second row, middle

24    seat.

25              THE COURT:  I'm just looking for your name,
```

H69KDZHC

1   Mr. Donaldson.  I got him right here now.

2              Okay.  Mr. Donaldson, just show me who your client is

3   again.

4              MR. DONALDSON:  Second row, middle seat.

5              THE COURT:  I see.  Good afternoon.

6              MR. FASULO:  Good afternoon, your Honor.  Louis

7   Fasulo, Fasulo Braverman & Di Maggio, for Azer Arslanouk,

8   seated to my right.

9              THE COURT:  Good afternoon, both of you.

10             MR. LAZZARO:  Lance Lazzaro, for Nazo Gaprindashvili.

11  She's seated here, Judge.

12             THE COURT:  Good afternoon.

13             MS. STERNHEIM:  Good afternoon, your Honor.  Bobbi

14  Sternheim, for Mikheil Toradze, who is seated next to me.

15             THE COURT:  Good afternoon, both of you.

16             MR. MILLER:  Good afternoon, your Honor.  Charles

17  Miller, representing Yuriy Lerner, seated immediately to my

18  right.

19             THE COURT:  Good afternoon, both of you.

20             MS. KELLMAN:  Good afternoon, your Honor.  Susan

21  Kellman.  My client is seated beside me, Denys Davydov.

22             THE COURT:  Good afternoon, both of you.

23             MR. FRISCH:  Good afternoon, Judge.  Andrew Frisch,

24  for Mr. Mitselmakher, who is to my left.

25             DEFENDANT MITSELMAKHER:  Good afternoon.

H69KDZHC

1           THE COURT:  Good afternoon.

2           And we've got?

3           MR. PRIESTON:  Evans Prieston.  I'm for

4  Mr. Buziashvili, who is present next to me, your Honor.

5           THE COURT:  All right.  Thank you.

6           MS. NEWMAN:  Good afternoon, your Honor.  Donna R.

7  Newman, on behalf of Akaki Ubilava, who is to my right.

8           And I'm standing in for Irving Cohen, who represents

9  Evgheni Melmen, who's standing to my left.  Mr. Melmen has

10  consented to my appearance on his behalf.

11           THE COURT:  Thank you.  And good afternoon.

12           I think that is -- one more?

13           MR. GREENFIELD:  Yes, your Honor.  Good afternoon.

14  David Greenfield, for Mr. Kanadashvili, who's standing to my

15  left.

16           THE COURT:  Good afternoon.

17           MS. SCOLARI:  Lisa Scolari, for Semyon Saraidarov.

18  Good afternoon, your Honor.  He's right here, next to me.

19           THE COURT:  Terrific.  Good afternoon.

20           Now I think we've actually got all the rows, right?

21           THE DEPUTY CLERK:  Yes.

22           THE COURT:  One thing I want to say before we proceed

23  further is I do know that certain defendants are wearing the

24  equipment that allows them to hear the translation.  From time

25  to time, the battery runs out, or you need to turn up the

sound, or something happens, and you might not actually be able

to hear.  If that occurs, please raise your hand, or nudge your

lawyer, or otherwise make it clear to us, if you're over here

in the jury box, that you can't hear, and we'll get it fixed,

all right?  It's very important that everybody be able to hear

everything today.

I'd like to start off by -- let me just tell you folks

what I understand the state of play is.  I understand that each

of the defendants who are here and present in court today have

been presented and arraigned, and, therefore, that our task

right now is to have an initial conference where we'll talk

about the nature of the discovery in this case, a schedule for

the production of that discovery, and then next steps.

So, that's what I think the agenda is.  Tell me if

someone hasn't been presented or arraigned first, and then

we'll resolve any issues that may be open there.

MR. ADAMS:  Certainly.  No one in the courtroom

today -- everyone in the courtroom, rather, has been presented

and arraigned already.  There are two people today who will go

through the same process, and I will contact chambers to set up

a conference for them as well.

THE COURT:  All right.  Terrific.

Then let's move on to a description from the

government of the nature of the discovery in this case and your

plan for production.

1          MR. ADAMS:  Certainly, your Honor.

2          With permission, and to give some context to the

3     discovery, I'd like to give the Court and the defendants today

4     sort of an overview of the case generally, and that will, I

5     think, make it a little easier to understand exactly what kinds

6     of discovery categories we're talking about.

7          THE COURT:  All right.  That's fine.  Just make sure

8     you speak slowly.  Just because of the translators, extra

9     slowly.  You're not speaking particularly quickly, but I want

10    to make sure --

11         MR. ADAMS:  Certainly.

12         THE COURT:  -- the translators are able to get

13    everything.

14         MR. ADAMS:  Certainly.

15         And I will look over.  If there are problems, just

16    raise a hand.

17         So, this is a racketeering case principally.  It

18    centers around a core group of defendants, and, in particular,

19    one defendant, a man named Razhden Shulaya, who's not in the

20    courtroom today.  He was arrested on Wednesday at the same time

21    as the majority of the defendants here, but in the District of

22    Nevada.  He's been detained pending transport, and we expect

23    him in the district as soon as the marshals can produce him

24    here.

25         The crimes with which what we are referring to as the

H69KDZHC

Shulaya enterprise were engaged are vast and varied, and I will

go through a couple of categories.  It's laid out in the

indictment.  There's some overlap between them, and each of

these categories involve usually overlapping membership within

sort of the lower tiers of the Shulaya enterprise.

At the core of the investigation was originally an

illegal gambling establishment.  There's a poker house in

Brighton Beach.  The poker house acted as kind of a

headquarters for the Shulaya enterprise, and it hosted an

illegal poker game on a regular basis.  There were a number of

the defendants involved in running or managing the poker game.

From this illegal gambling activity, a number of other

crimes stemmed.  There was extortion of people who engaged in

gambling at the poker house.  People who ran up debts in the

tens of thousands of dollars to the Shulaya enterprise were

extorted, threatened, intimidated by members of the Shulaya

enterprise, in order for the enterprise to recoup its losses or

recoup, rather, its debts owed by those people.

The use of the poker house also included a safe and

secure, or what the enterprise believed was a secure, location

for acts of violence.  These related to the poker house or the

enterprise's efforts to instill a sense of fear among its

lower-level participants of Shulaya and his core group, such

that when people went out of line, from the perspective of

Shulaya, they would be injured, and in some cases, badly

H69KDZHC

injured.  This is captured on video in several instances.
There is one instance in which a confidential source himself
was actually assaulted, both by Shulaya himself and by
Mr. Khurtsidze, who will be the subject of a bail discussion
later today.

        The poker house had a surveillance camera.  The
surveillance camera was attempted to be dismantled and thrown
away as a result of some arrests in an unrelated or a different
and separate case, a different separate investigation, that
took place across the river in the Eastern District of
New York.  Sometime in October or November of last year, there
were some arrests, and the poker house shut down.  Shulaya took
the video system, tried to get rid of it by giving it to the
confidential source.  So, the interior video of the poker house
is available, and if this goes to trial, the jury is going to
see instances of sometimes brutal violence in furtherance of
the enterprise.

        THE COURT:  So, who was maintaining these tapes?  This
was a surveillance setup that was set up by the alleged poker
house and maintained by them?

        MR. ADAMS:  Correct.

        THE COURT:  And happened to just capture whatever was
going on inside the poker house within the view of the camera
on tape?

        MR. ADAMS:  Correct.  There are two ways in which this

1    was accessible.  Even before they attempted to throw away the

2    server -- I say tape, but it's an electronic digital

3    surveillance system.  Even before that, the FBI, through a

4    confidential source, had access to the video footage from the

5    surveillance because the enterprise had essentially an iPhone

6    app where you could go and look at live what was playing inside

7    the poker house if you had access and permissions to look at

8    the interior of the house.  The Shulaya enterprise gave that

9    access to a confidential source, and, so, it was easy and

10   available to look at any point and see what was happening

11   inside the poker house.

12          THE COURT:  Was that material then retained not only

13   on the server, but, also, was it put onto a cloud someplace in

14   addition?

15          MR. ADAMS:  I don't believe it's on a cloud.  The

16   server is maintained and in FBI custody.  We were able to

17   capture portions of video.  The CS could show that video to the

18   agents and record certain snippets of it.  It's not the

19   entirety predisposition of the server itself.

20          That's just the video, it's not audio.  There was no

21   Title 3 or anything on that particular device.

22          In addition to the poker house, there was some other

23   after-hours clubs and social clubs that the Shulaya enterprise

24   was engaged in.  There are investments by Shulaya himself and

25   other members of the enterprise into a number of clubs.

H69KDZHC

Mr. Azer Arslanouk is one of the defendants here today, was

involved in managing certain of those clubs.  Those clubs

hosted narcotics sales.  In some situations, the Shulaya

enterprise's protection was sought for other clubs that would

offer, again, narcotics sales, and in one instance, there are

consensually obtained recordings discussing the use of the

Shulaya enterprise's protection for prostitution.

There were, by Mr. Arslanouk's own words, bribes being

made to law enforcement in some instances in order to ensure

the protection for that side of the Shulaya enterprise.

In addition to this extortion racquet, the gambling

racket, and the violence surrounding the poker house, there are

a number of other schemes that the Shulaya enterprise engages

in.  A lot of the same people involved in what I just described

are also involved in these other schemes.

There is -- and I will lump these three together --

there is an interstate transportation of stolen property

scheme, there's a contraband cigarette receipt and distribution

scheme, and there's a narcotics charge in here as well, in

which one member who's charged in the RICO is also charged with

just a stand-alone narcotics case or narcotics charge.

With respect to the cigarettes, various members of the

enterprise would receive contraband cigarettes or unmarked

cigarettes.  These were actually being provided by the FBI and

distributed through the Shulaya enterprise.  The conspiracy

H69KDZHC

understood these to be contraband, stolen cigarettes.  And we are talking about merchandise somewhere on the order of over a million dollars worth of contraband tobacco.

In addition to cigarettes themselves, there is a cargo theft scheme here, which is a little more complicated, and involved merchandise and cargo, essentially, of any kind.  The idea was that different shipments of any sort of cargo would be stolen using a particular method of impersonating a trucking company or pretending to be a legitimate trucking company, putting in a bid to win the right to go pick up a shipment of whatever the bid might be for, and then simply purloining, stealing, the shipment.

So, the indictment talks about one of these incidents involving approximately 10,000 pounds of chocolate confections. These were peanut butter cups that were being supplied by one company and intended for delivery to its customer.  The Shulaya enterprise, certain members of it, put in a bid using false names, false identification, won the bid, picked up the shipment, and took it to a warehouse in Brooklyn, where they then sold it, or believed they were selling it, to a black market distributor that was, in fact, a confidential source.

The enterprise went beyond that one sale.  There are also intercepted wire calls, which I'll talk about in a moment, involving the receipt and sale of such things as large shipments of laptops, light bulbs in one instance, and chicken

feed, with a D, in enormous quantities.  I believe some of that
was actually found in a search warrant executed at the same
time as the arrest.

          This cargo theft scheme I mentioned took advantage of
false identification and fake names.  There is, in addition to
this cargo theft and the cigarette scheme, a false ID
counterfeit credit card and forged check scheme that, again, an
overlapping group of members of the enterprise were engaged in.

          Certain members of the enterprise, including people
who are here today, were involved in the manufacture of false
identification documents, the creation of counterfeit credit
cards, obtaining forged checks for cashing at various locations
in and around the New York area and in and around the Las Vegas
area, as well as in Florida, at different times during the
course of the conspiracy.

          Moving from those schemes to one that has a very
different sort of flavor, there is a wire fraud charge in the
indictment.  It's also listed among the overt acts in the RICO
conspiracy, and I will refer to it as the casino scheme.  The
casino scheme involves obtaining electronic slot machine
samples, an actual electronic slot machine, or the programs,
the motherboard of the device itself.  Members of the
enterprise and people they hire take the inner workings of
those machines, copy them, mirror those machines, study their
inner workings, and essentially figure out what is supposedly a

1    random number generator and how it works.  It's not entirely a

2    random number generator, and so they're able to analyze that

3    machine and figure out, based on what a machine in a casino is

4    displaying at any given moment, where within the life of the

5    random number generator -- seemingly random number generator

6    that machine in the casino is, such that someone sitting in the

7    casino can speak to a member of the enterprise or somebody we

8    believe in Russia with access to these programs, and that

9    person can say, bet now.  The person sitting in the casino in

10   realtime places a bet and wins effectively every time, turning

11   the slot machine from a game of chance into an ATM.

12           The evidence on this is going to include both

13   surveilled deliveries of a sample slot machine to the Shulaya

14   enterprise, wiretapped recordings between Shulaya and multiple

15   members of the enterprise regarding the inner workings of the

16   scheme, regarding the effectiveness of some of the software and

17   hardware used in mirroring the slot machines, and discussing

18   the effectiveness of the scheme itself with people actually in

19   the casino while they're winning, testing the scheme itself.

20           I'll talk about some seizure evidence, but those will

21   include, in some cases, motherboards of slot machines of

22   exactly the kind I'm talking about.

23           Finally, and really quite different from anything I've

24   talked about so far, certain members of the enterprise,

25   including Mr. Dzhanashvili, Mr. Buziashvili, and others, were

H69KDZHC

1      engaged in what I'll refer to as --

2                   THE COURT:  When you're saying Dzhanashvili, that's

3      D-Z-H-A-N, correct?

4                   MR. ADAMS:  Correct, your Honor.  Yes.

5                   THE COURT:  All right.  Continue.

6                   MR. ADAMS:  This robbery scheme worked as follows:

7      There was a female coconspirator, not charged in this

8      indictment, who was effectively employed by the Shulaya

9      enterprise, and most directly by Mr. Dzhanashvili, to seduce

10     and lure different men who people believed the enterprise

11     believed to be in possession of money or had access to money.

12     The idea was to lure these people to a hotel, or casino, or

13     someplace where this coconspirator would be in a position to

14     drug, or knock out, or if need be, just physically overwhelm

15     the person I'll call the mark, with the understanding being

16     that we will steal this person's money, steal this person's

17     credit cards.  There are wire intercept calls really in great

18     detail and with some explicit facts about how the scheme would

19     work, including discussions about how to use chloroform gas in

20     order to knock somebody out, where to obtain it, and exactly

21     how they would subdue and rob these marks.

22                  There will be evidence of surveillance of the marks by

23     other members of the enterprise, including Mr. Saraidarov,

24     Mr. Uglava in some instances.  These marks would frequent

25     places where those two people worked.  They would alert other

H69KDZHC

 1   members of the conspiracy to the presence of those people, so

 2   that this coconspirator could be introduced to those potential

 3   victims.

 4           So far as we know, the FBI was able to intercept and

 5   stop any actual robberies from occurring through the course of

 6   the conspiracy as a result of exactly how express the details

 7   over the wire were.

 8           Those are, I think, the principal schemes charged in

 9   the indictment.  They really cover the background to the

10   discovery, and unless the Court has questions about that

11   aspect, I'll move to the --

12           THE COURT:  No.  Why don't you go on to the more

13   granular details of the discovery.

14           MR. ADAMS:  Sure.

15           So, this has been an investigation that the FBI has

16   been working on since approximately 2014.  It has involved the

17   use of numerous confidential sources.  Those confidential

18   sources have obtained approximately -- well over 200 hours of

19   consensually recorded body wire recordings.  Those are coupled

20   with surveillance.  In some instances, they're coupled with

21   photographs.  In some instances, it's coupled with video of

22   these meetings corroborating the surveillance itself or the

23   recordings themselves.  And we have at this point draft

24   transcripts of much of that and summaries of much of that,

25   which we'll be in a position to begin producing shortly.

H69KDZHC

```
 1              THE COURT:  What language are these in?

 2              MR. ADAMS:  Russian, Georgian, English in some

 3      instances, but overwhelmingly in Russian and Georgian.

 4              THE COURT:  When you say you have draft transcripts,

 5      do you have draft transcripts with translations or only into

 6      the first language?

 7              MR. ADAMS:  The former, your Honor, into English.

 8              THE COURT:  All right.

 9              MR. ADAMS:  In December of last year, we began a

10      series of judicially authorized wiretap intercepts over a

11      number of phones.  Those continued until Wednesday of this

12      week.  So, we have approximately six months of wiretap

13      recordings.  Those began with six target phones that went down

14      to five target phones, I believe, after one month.  There were

15      three owners of those multiple phones - Ms. Kanadashvili had

16      her phone intercepted for one month, Mr. Shulaya himself at

17      various points had up to four phones being intercepted, and

18      Mr. Dzhanashvili's phone was intercepted for the entire period

19      as well.

20              THE COURT:  How many separate initial wire

21      applications as opposed to renewals?  How many are we talking

22      about?

23              MR. ADAMS:  One single application that covered all

24      the phones.

25              THE COURT:  All right.
```

H69KDZHC

1          MR. ADAMS:  The initial application covered only wire

2     intercepts.  We expanded to electronic intercepts as well over

3     certain lines.

4          There are, in the process of burning to DVDs and hard

5     drives, the conversations themselves.  The line sheets should

6     be prepared early next week.  I will say that the volume is

7     enormous.  There are, over Mr. Dzhanashvili's phones alone,

8     approximately 11,000 pages of line sheets that we have.  We

9     have detailed translations into English for many conversations.

10    We have summaries of the others in English.  We don't have

11    detailed translations of every single conversation that

12    happened.

13         THE COURT:  All right.  Are the 11,000 pages -- no,

14    let me ask you this:  Are people talking in code, or are they

15    going to be searchable in some way that's going to be

16    meaningful?

17         MR. ADAMS:  They are both, frankly.

18         THE COURT:  Both?

19         MR. ADAMS:  There's plenty of speaking in code or

20    speaking sort of in very clipped ways, including discussions

21    about how we should not speak about this on the phone over and

22    over.  It is all word searchable.  So, if you know phone

23    numbers -- and we will be helping defense counsel act as a

24    spotlight for relevant phone numbers -- it should be easy to

25    search by phone numbers.  There are particular nicknames or

H69KDZHC

1    aliases that we've learned throughout the course of the wiretap

2    that we can assist defense counsel in working through.

3           So, at first glance, I imagine it may seem opaque, but

4    we will be here to help defense counsel work through that.

5           THE COURT:  All right.

6           MR. ADAMS:  That 11,000, by the way, that is only on

7    Mr. Dzhanashvili's phone.  Mr. Shulaya had four phones at one

8    point.  I believe there's something on the order of 60,000

9    calls and SMS messages intercepted over the course of six

10   months.

11          Geolocation data for those cell phones and the cell

12   phones of many other of the defendants here today will be

13   provided.  Approximately 30 different cell phones for which

14   geolocation data was obtained at different points.  And that

15   stuff becomes relevant in a number of ways, including placing

16   people at particular check-cashing locations or the areas

17   placing people at casinos that are of interest, at cigarette

18   deals, the movement of interstate stolen property.  The

19   geolocation data comes into play in that way.

20          There are a large volume of pen registers and the data

21   from that -- I think it's 45 lines over the course of about two

22   and a half years -- just showing the numbers and sort of header

23   information without contacts between suspects in the case.

24          There is the video from the poker house that I spoke

25   about earlier.  There's video surveillance from different

H69KDZHC

1   casinos that we were aware that the casino scheme was being

2   executed at more recently.  So, those casinos were able to give

3   us surveillance video of enterprise members engaged in the

4   fraud.

5           There are records related to the sale of these

6   contraband cigarettes sold through and to the Shulaya

7   enterprise.  The bank records and records from Western Union

8   and MoneyGram reflecting the movement of money by the

9   enterprise.

10          THE COURT:  And can you give me a sense of volume as

11  to those and whether they are going to be primarily electronic

12  form?

13          MR. ADAMS:  They will be in electronic form.

14  Currently, it's not in a particularly enormous volume, and

15  there are some spreadsheets associated with those that make it

16  a little easier.  I will say as a result of the search warrants

17  earlier this week, I imagine that that aspect – bank records,

18  Western Union – will grow substantially in the next few weeks.

19          There will be some records from these trucking

20  companies and shipping companies that were the victims of the

21  cargo theft scheme that I spoke about earlier.  That's not

22  particularly voluminous.  There are contemporaneous records

23  from the shipping companies saying we got a bid from this

24  person, and then that shipment went missing.  There's some

25  related records to things like the phone numbers used to

H69KDZHC

1   conduct that scheme, the email addresses used to conduct that

2   scheme, but, again, that's not a massive amount of material.

3   One will be larger, and we are really only now in a position to

4   even start working on this as a result of the search warrants

5   that were executed on Wednesday.

6           THE COURT:  You said only the search warrants that

7   were executed on?

8           MR. ADAMS:  Wednesday.

9           THE COURT:  On Wednesday?

10          MR. ADAMS:  This past Wednesday.

11          THE COURT:  All right.

12          MR. ADAMS:  Actually, before I get to that, I'll

13  mention, we had obtained email account search warrants on three

14  different accounts over the course of the investigation, one

15  belonging to Mr. Zurab Buziashvili, one related to -- I only

16  know it by the email account, it's not in somebody's particular

17  name and is anonymized, but it's related to the credit card and

18  the card theft fraud, but we'll be providing that, and in one

19  account in the name of Mr. Savgir, who's currently a fugitive.

20  Mr. Savgir's role with respect to the enterprise was the

21  creation of false identification documents and counterfeit

22  credit cards primarily.  Those email accounts reflect the

23  receipt of things like photographs for use in creating false

24  identifications, including photographs of people who actually

25  were at casinos and other places that would cash checks and, in

H69KDZHC

1  fact, did cash checks with other people related to the

2  enterprise.

3          Mr. Savgir's email account is not particularly huge in

4  this case.  We limited the time period for which we requested

5  records from that account.  I think that the order of emails

6  there is approximately a thousand emails.  It's not 10,000 or

7  100,000.

8          So, with that, I'll talk for a moment about the recent

9  search warrants of a couple of premises that were executed this

10 past Wednesday.

11         We had five different premises subject to search

12 warrants in the Eastern District and in the District of New

13 Jersey.  The premises in the District of New Jersey is

14 Shulaya's personal residence.  And it was, frankly, just a

15 trove of electronic information and devices.  Agents seized

16 approximately --

17         THE COURT:  Can you give me -- you're about to say?

18         MR. ADAMS:  Yes, I think I'm about to answer.

19         Agents seized approximately 34 different cellular

20 different telephones, ten different iPads, hard drives, USB

21 keys, and other electronic devices, drugs, what appears to be

22 cocaine or the paraphernalia related to prior possession of

23 cocaine.

24         THE COURT:  In personal use quantity or something that

25 is suggestive of something else?

1          MR. ADAMS:  I was just looking at this before we came

2     over.  Individually, they would be personal use, I would think,

3     but it is quite a number of vials.  We're still looking to see

4     how it was packaged and whether we think it was distribution.

5          A skimming device, which is relevant to the

6     counterfeit credit card scam.  Skimming devices were found in

7     other premises, which I will discuss in a moment, and are

8     integral to running these counterfeit credit card scams and

9     obtaining stolen credit card information.

10         Western Union receipts along the same lines that we

11    had understood Shulaya to be moving money through the wire and

12    through earlier investigation.  There are two strong boxes or

13    safes that are not just your Wal-Mart brand safes, they weren't

14    cracked immediately by the FBI.  The FBI is still working to

15    get into the safes pursuant to the warrant, so I'm not sure

16    what's in those just yet, but the agents did find a crossbow in

17    Mr. Shulaya's residence.  The reason that it is relevant is

18    that it was a present from another for -- or extremely high

19    level figure within the Russian organized crime world to

20    Mr. Shulaya as a birthday present.

21         So, for the moment, I don't know what the volume of

22    data or information on the iPads or phones will be --

23         THE COURT:  All right.

24         MR. ADAMS:  -- but we will be obtaining a follow-up

25    warrant for those electronic devices, and we can report to the

1    Court as soon as we know what's inside.  And it may well be

2    that certain of the devices are either empty or locked in a way

3    that we can't reasonably crack them.

4              THE COURT:  Then you've got four places in the

5    E.D.N.Y. in Brooklyn?

6              MR. ADAMS:  Yes, your Honor.

7              Mr. Dzhanashvili's residence was the subject of a

8    proceeds warrant.  It included fake identifications, false

9    state identifications, thumb drives, which have not yet been

10   searched -- again, with all of these electronic devices that

11   I'm mentioning, we're going to be getting a follow-up search

12   warrant for all of this -- and a slap-on GPS device.  It

13   appears to be of the kind that you would use to track a car.

14   We are, at this point, not sure if it contains any relevant

15   data.  We need to consult with the manufacturer to see what

16   might be kept on that.  That's Mr. Dzhanashvili's residence.

17             Mr. Melman's residence was the subject of a warrant.

18   Mr. Melman was primarily of interest in the course of the

19   investigation with respect to the casino fraud.  Mr. Shulaya

20   and Mr. Melman are in contact frequently over recorded

21   conversations and the wiretap discussing the effectiveness of

22   some of the servers, essentially troubleshooting the servers as

23   they're attempting to execute the scheme.  And Mr. Melman's

24   apartment was one hub from which that sort of troubleshooting

25   and technical support was being offered.

H69KDZHC

1          Mr. Melman's residence included devices consistent

2     with the casino fraud.  It included devices consistent with the

3     counterfeit credit card scheme as well, including devices that

4     appear to be either skimmers or other electronic devices

5     associated with the counterfeit and credit card scheme.  And

6     there's a motherboard of the same kind that is associated with

7     a particular kind of electronic slot machine.  That was also

8     found in Mr. Melman's apartment.

9          There are approximately -- well, there were actually

10    well over ten devices -- I don't have the exact number --

11               THE COURT:  In total?

12               MR. ADAMS:  In total.

13               -- in Mr. Melman's apartment.

14               THE COURT:  All right.

15               MR. ADAMS:  Mr. Savgir's apartment was the subject of

16    a warrant.  Mr. Savgir's apartment included a large amount of

17    manufacturing equipment for false identifications and

18    counterfeit credit cards.  It included very high-end printers,

19    it included state holograms of the sort that you might see on

20    the front of your driver's license from various states, all

21    very well organized in his apartment, photo printers,

22    laminators and sample laminate, all consistent with the

23    creation of false identifications, a number of flash drives,

24    which have not yet been searched, and a guide to the appearance

25    of various state identification documents.  It's the kind of

1    thing that you might have if you were a bartender to check IDs.

2    It's also the kind of thing that you might have if you're

3    creating fake IDs.

4           Finally, there were two different premises both

5    associated with Mr. Marat-Uulu, who's charged currently in the

6    narcotics conspiracy in this case.  There is a separate

7    complaint that the Court has as well that relates to a number

8    of firearms charges in a murder-for-hire conspiracy.  We

9    charged that by complaint because the facts sort of percolated

10   at a later time when we were going to the grand jury, but we

11   intend to supersede that as well.  But Mr. Marat-Uulu's

12   apartments were searched in the course of the arrest on this

13   indictment.

14          And there were basically two different schemes

15   reflected here.  One has to do with a fake charity scam that

16   Mr. Marat-Uulu has discussed in conversations with different --

17   with a source.  That's essentially exactly what it sounds like,

18   and it purports to be a charity.  It takes money, it's not

19   actually a charity.

20          And then in Mr. Marat-Uulu's other apartment, there

21   were a trove of devices and equipment associated with false

22   identifications and counterfeit credit cards, including

23   skimming devices, USB keys that have not yet been searched, and

24   consistent with what we had understood from some information

25   from a confidential source, there was mail from Russia that had

arrived at Mr. Marat-Uulu's residence.  When opened, it looked to be a voltometer, something for measuring the voltage of electronic devices.  When that device itself was opened, what was actually inside of it is more credit card skimming devices and essentially more devices for the use in this counterfeit credit card scam concealed to be smuggled into the country.

Your Honor, finally, there is one defendant who was incarcerated at the time of the arrest on Wednesday.  This is Mr. Suyunov.  He's currently in the Southern District of Florida, and we will be writting him up here along with anybody else who's detained in Florida.  There are three other defendants down there right now.  Mr. Suyunov was actually arrested earlier.  He was caught by local law enforcement in the Miami area in possession of counterfeit credit cards, devices.  A laptop on his person was searched at that time pursuant to a search warrant from the Southern District of Florida.  It also contains spreadsheets and documents that appear to be stolen account information, among other relevant data and information.

I think that that covers the scope of discovery and the major categories of the kinds of discovery that we anticipate.

THE COURT:  All right.  Why don't you describe for us your plan with production.  I'm sure that you've got something in mind.

H69KDZHC

1          MR. ADAMS:  Yes.

2          I do think that this is a case where appointing a

3    discovery coordinator is going to be useful and helpful just

4    given the volume of electronic discovery and the various

5    formats.  What we're going to do in the meantime is begin to

6    download the recordings.  That will take a few days just to

7    download them.  And to the extent that we don't have a

8    discovery coordinator to mass-produce this for approximately 30

9    defendants, we'll start making the copies to provide to defense

10   counsel.  We're going to start with the recordings, start with

11   the transcripts, and start with the surveillance photos and

12   videos, which we're going to, in the first instance, provide on

13   DVDs.  If we can't get a discovery coordinator in short order,

14   then what I think we'll do is ask for hard drives from people,

15   so that we can put -- so we don't have to drown people in DVDs,

16   and so we don't have to break up email accounts and things like

17   that.

18          And we will be starting on that -- we have already

19   started on that, frankly.  We have many of the recordings, and

20   the line sheets will be coming shortly.  I can start making

21   copies of those things today.

22          THE COURT:  So, you'll essentially put everything that

23   you have received so far in one form or another onto a hard

24   drive.  Putting aside for the moment other potential forms of

25   discovery, you're able to put everything onto a hard drive or

H69KDZHC

1     hard drives and then produce those?

2              MR. ADAMS:  Yes.

3              THE COURT:  How long would it take you to do that for

4     one?  And then tell me about the duplication timing necessary

5     to make the copies.  Once again, I'm not suggesting that we

6     don't have somebody who fulfills a centralized role, but I just

7     want to get a sense of the timing on the outside.

8              MR. ADAMS:  Sure.

9              So, to fully download the recordings will take at

10    least a couple of days.  Just the speed by which those files

11    transfer will take a while, and I expect that copying 30 copies

12    of it is going to take probably a couple of weeks to completely

13    complete, but we have started that and will continue that today

14    and over the next few days.

15             The line sheets will go faster.  Those themselves do

16    take a little while to download, but we should be able to get

17    those and make copies.  I am hopeful by the end of next week,

18    we can have copies for all of the defendants, so that people

19    can at least begin reviewing the draft transcripts and the

20    draft summaries.

21             Similarly, the geolocation data, pen register

22    information, there's quite a bit of it, but just the nature of

23    that data shouldn't take as long.

24             THE COURT:  So, a couple of weeks?

25             MR. ADAMS:  I think so for that, yes.

H69KDZHC

1       THE COURT:  All right.

2       MR. ADAMS:  Similarly, the email files are not

3  massive.  We can copy those relatively quickly and then start

4  duplicating them on the same timeline as the geolocation data.

5  The format there differs, I'll say.  Several of the accounts

6  are from Gmail and Google in in-box format, another is from a

7  Yahoo account, and I don't know off the top of my head if

8  that's the same format or not.

9       THE COURT:  So, then, let's approach it this way:

10  What I am interested in is, just so I understand the outside

11  time frame, if the government -- and I understand you've

12  commenced this process already -- were to take everything that

13  is going to constitute the discovery in this case, and to put

14  it on hard drives, and to duplicate it 30-plus times, you need

15  a month to six weeks to do that?

16       MR. ADAMS:  Yes.

17       THE COURT:  Am I right?

18       MR. ADAMS:  I think that's correct.

19       THE COURT:  Okay.  So, let's call it six weeks.

20       And you can roll out the production; is that right?

21       MR. ADAMS:  Absolutely.

22       THE COURT:  And you would be able to roll out the

23  production in a similar way for similar defendants; in other

24  words, line sheets could potentially, along with whatever else

25  is available, geolocation information, go out within a couple

H69KDZHC

1    of weeks, while the recordings might take longer; is that

2    correct?

3              MR. ADAMS:  Yes, your Honor.

4              THE COURT:  All right.

5              So, that gives me a sense as to volume, which is very

6    significant --

7              MR. ADAMS:  Yes.

8              THE COURT:  -- and the number of issues that may be

9    involved in review.

10             Okay.  The one thing that it sounds like -- well, was

11   there something else you wanted to say or -- I just want to

12   make a couple of comments.

13             MR. ADAMS:  No, your Honor.  There are obviously a few

14   defendants who are at least detained for the moment, and we'll

15   be working with the MDC or the MCC, as necessary, to make sure

16   that they have access to all the same stuff on the same

17   timeline.

18             THE COURT:  Okay.

19             So, here is what I am going to suggest:  We've got a

20   large group of people here who will want to both be heard on a

21   number of these issues and talk to their lawyers about a number

22   of these issues.  What I'm going to suggest is that because the

23   government has raised the question of what I am going to call a

24   centralized repository for some of this discovery information,

25   I'm going to have counsel and the government confer on that and

H69KDZHC

1    make an application, if you folks want to proceed that way, to

2    me in a letter, which people can join in.  That way, I would be

3    able to understand, quite clearly, what you're thinking, who it

4    is, and what responsibilities this individual or individuals

5    would have, and, importantly, what responsibilities they would

6    not have.  As I'm sure you folks are aware, discovery issues,

7    including for large cases, has been something that the district

8    has grappled with increasingly, and the use of individuals as

9    centralized places for cases to orient themselves around has

10   been something that people have talked about, used to varying

11   degrees.  There are, in my view, some ways that that is done

12   efficiently and appropriately, and there are some ways in which

13   that can be set up to create problems that you want to avoid.

14          So, rather than going into any of that now, why don't

15   I ask the government to lead a discussion in whatever form,

16   through email, whether or not defense counsel is going to

17   appoint a point person to have a discussion about that, however

18   you folks want to do it.  But when the application is made, I

19   just want to let you folks know I'll be looking very carefully

20   at it, and, in particular, if an application is made, at

21   ensuring that each defense counsel retains primary

22   responsibility, and ultimately for their client, exclusive

23   responsibility for the review of discovery and for the

24   assurance that all appropriate discovery has been received and

25   is available.  In other words, you can't put off onto somebody

H69KDZHC

1   else negotiations with the government around discovery for you

2   because different clients have different interests, and there's

3   an enormous number of different interests sitting in this room,

4   and you can't have somebody else do your discovery review for

5   you who is centralized with every other defendant.

6        However, there may be ways in which efficiencies are

7   gained, and I want to leave that open to you folks to make that

8   suggestion.  So, let me put that onto the top of the

9   government's to-do list, but what I'm going to suggest, also,

10  is that the government may need to work on two tracks, which is

11  getting a set of this as a master set ready for production

12  because if it takes too long for you folks to work out your

13  application, or if you folks and I don't agree on what's

14  appropriate, and it either takes multiple iterations to come to

15  some resolution or if I ultimately disagree with it, I don't

16  want that application to be the creation of a big delaying

17  factor in the production of discovery.

18       So, the second thing is, I want the government to

19  ensure that it is creating a master set on hard drives that can

20  be duplicated in relatively short order, however many number of

21  times you're going to need to be able to do that, and to

22  ensure, in all events, on their calendar that discovery is

23  produced -- that which has been discussed today and which has

24  been received to date is produced in six weeks.

25       Now, I would expect, as Mr. Adams has already

1    previewed, that there is going to be additions, both things

2    which will fall out of the review of the five search warrants

3    recently executed, what's on the various electronic devices

4    will have to be assessed, that may take a little bit more time,

5    so we'll check in on that, as well as the bank records

6    subpoena, it sounds like there's more to come there, and

7    there's already an expanded array of that that's anticipated.

8    So, I don't expect that every single piece of paper relevant to

9    this case is going to be produced in six weeks, but the bulk of

10   what you've already described, Mr. Adams, I would expect would

11   be produced within six weeks.

12          So, get me your application on this centralized

13   person, if that's what people decide, some or all, you don't

14   have to all be onboard with it, but if that's the way you folks

15   want to agree, get me that application, as necessary.

16          So, discovery in six weeks.

17          The other thing that I'm going to suggest is that I do

18   think, assuming that people have discovery in six weeks, that

19   people will not know whether or not they want to bring any

20   motions to suppress potentially for, I would say, probably 90

21   days at least.  This is just motions to suppress.  I'm putting

22   aside for the moment other potential motions because I think

23   that the review of discovery here is going to be very, very

24   significant.

25          So, what I'd like to do is, now that people have heard

H69KDZHC

1    this, and once people get their hands on some of it, I'm going

2    to ask defense counsel, if they can, to either submit

3    individual letters, or, hopefully, you'll be able to come to

4    some accommodation where you'll get together and talk about a

5    briefing schedule, and you'll know and be able to suggest to me

6    how much time you need to bring appropriate motions, any

7    motions that you want.

8            So, for instance, it may be that you will come back to

9    me and say we can't even assess, with this volume, whether

10   we've got suppression motions until X date, but people who want

11   to file suppression motions, defense counsel is in agreement

12   that those motions should be brought not later than X date.  If

13   you can't agree, you're welcome to all submit your individual

14   letters to me, and I'll figure something out and go from there,

15   but I'm hopeful that you will be able to either sort yourself

16   into certain groups where you're able to coordinate some of

17   that or to find a person who can assist or volunteer and

18   take -- draw the short straw to act as a coordinator of at

19   least that initial scheduling, because I don't think that we

20   know enough right now to set those dates.  I'm suggesting 90

21   days for suppression motions, but it may be that you need more

22   time than that, I don't know.

23           The second group of motions would be other motions.

24   And I separate those, typically.  They don't have to be, but I

25   typically separate suppression type motions from other motions.

1    The reason for that is because, in my view, suppression type

2    motions, you usually are able to assess or evaluate searches

3    that occurred with or without warrants or assess the Title 3

4    applications or the warrants and/or postarrest statements, the

5    kinds of things that typically lead to suppression motions,

6    relatively easily.  I'm not saying they're simple issues to

7    evaluate, but they present a different bucket of issues than

8    review of the entirety of the production to figure out if

9    you've got a motion that's somewhere buried in a thumb drive

10   that was found within a residence.  So, I think of this as sort

11   of two separate schedules for motions.

12          And then what I think people should do is plan on

13   coming back here.  I think what we should do is come back here

14   in 60 days, if that sounds like the right kind of time frame,

15   to have another conference.  I'll have gotten a letter in the

16   meantime.  We'll talk about the date of that letter.  It can't

17   be any earlier than six weeks from now, because you won't even

18   have the discovery, and I won't be sure you've even gotten the

19   suppression materials or even begun to understand it.  Maybe it

20   should be 75 days from now.  I see Ms. Sternheim nodding her

21   head yes, so I am happy to make it 75 days.

22          MS. STERNHEIM:  Only because it would put us in mid-

23   to late August, and I know some of my colleagues have earned a

24   vacation.

25          THE COURT:  That's fine.

H69KDZHC

1        So, why don't we say -- Joe, you'll be looking for a

2   date 75 days from now.  Why don't we say that 65 days from now,

3   we're going to have a letter from counsel on a schedule for

4   motions.

5        Now, this is going to be subject to some adjustment.

6   Obviously, motions would not be expected to be included within

7   that calendar for materials that haven't yet been received.

8   Those are going to be dealt with at a separate time.  You're

9   going to be able to bring the motions that you need to bring,

10  that's not the issue.  This is just a matter of setting the

11  initial time frames for things.  So, let me get a letter on the

12  briefing schedule that will have a proposed briefing schedule

13  for suppression motions and other discovery motions, let me get

14  that 65 days from now, and 75 days from now, we'll actually

15  come in and then talk.  I will figure out, between now and

16  then, whether we're going to talk in groups, or maybe you folks

17  will suggest whether it makes sense to talk in groups or

18  whether you've got people who can be designated to talk as

19  primary spokespeople on a couple of issues.  Maybe I can get

20  that before the conference.  If not, I'll figure it out, but

21  let's get those dates right now.

22        So, 65 days, Joe?

23        THE DEPUTY CLERK:  July 14th.

24        THE COURT:  July 14th, I would want to get one or any

25  number of letters from defense counsel --

H69KDZHC

1           Joe, 65 days.

2           THE DEPUTY CLERK:  August 11th.

3           THE COURT:  He hasn't had lunch yet.  He's very

4   hungry.  I can hear his stomach growling from here.

5           So, Joe, what is it?

6           THE DEPUTY CLERK:  August 11th.

7           MS. STERNHEIM:  Judge, I understand that you just said

8   75 days.

9           THE COURT:  65 for the letter.

10          MS. STERNHEIM:  65 for the letter, but 75.  I'm

11  requesting, on behalf of the defense, that we return after

12  Labor Day.

13          THE COURT:  Yes, we'll do that.  So it won't be quite

14  75.  That's fine.

15          MS. STERNHEIM:  Thank you.

16          THE COURT:  Let's just do something after Labor Day.

17          Why don't we put aside, Joe, we'll need two hours for

18  it because I don't know how this is going to sort itself out.

19          THE DEPUTY CLERK:  Friday, September 8th, at 11:00.

20          THE COURT:  Friday, September 8th, at 11:00 a.m. for

21  the conference, and August --

22          What did you say?

23          THE DEPUTY CLERK:  August 11th.

24          THE COURT:  -- August 11th for the letter or letters.

25          If you can coordinate on the letter or letters

H69KDZHC

1    proposing a briefing schedule for motions, the two buckets that

2    I have talked about, terrific.  If you cannot, send me your

3    letter by August 11th.  I will then put in place a schedule or

4    we'll talk about it, depending on the nature of the letter, at

5    the September 8th conference.

6           At the September 8th conference, then we will

7    determine a trial date.  I don't plan on doing that right now

8    because I don't know how this is going to sort itself out in

9    terms of the duration that you folks are going to need to

10   review all of this discovery, and I think you'll know a whole

11   lot more.

12          If you're able to have certain discussions with each

13   other about potential trial dates on or before September 8th,

14   that would be terrific.  If you cannot have those discussions,

15   then what I will do is solicit some input on September 8th, and

16   I will set the trial date using my best judgment.  It sounds

17   like there may be a lot -- well, there obviously are going to

18   be a lot of people's calendars to take into consideration, but

19   since we're talking about a trial that I can't imagine

20   occurring sooner than a year, if somebody needed to try it

21   sooner, we would try it sooner, obviously there's a right to a

22   trial sooner, and we'll try it as soon as people want, but I'm

23   anticipating that I'm going to hear from defense counsel that

24   they're going to want a significant amount of time to get ready

25   for this case.  So, I'd like to have some proposals, and I

1   think it's actually easier with people's calendars when we're a

2   year out because they often have scheduled themselves a year

3   out with the same kind of fervor as they schedule themselves

4   for the near-in dates.  So, that's why I think setting a trial

5   date should prove actually ironically less difficult than it

6   would if we were trying to do it eight months from now.

7           So, we won't do that until September 8th, but we'll

8   talk about it September 8th.

9           Ms. Sternheim.

10          MS. STERNHEIM:  Yes, your Honor.  In light of the

11  number of defendants in this case and the case law in the

12  circuit, there would be no way that your Honor would be trying

13  all 30 of us together.  If your Honor could request of the

14  government that perhaps they could divide up, as they see best,

15  how they would be handling this, so for purposes of trial

16  dates, we, as a group, could discuss it amongst ourselves?

17          THE COURT:  I think that's a terrific suggestion, and

18  I'll ask Mr. Thomas and Mr. Adams to undertake that.  And we've

19  recently had some very good experience with getting people

20  bucketized in the right ways.  I think there's an art to it.

21          But, Mr. Adams and Mr. Thomas, why don't you folks

22  undertake that and share it both with the Court, so I can

23  understand that, as well as with defense counsel.  So, sometime

24  sufficiently in advance of September 8th, it would be useful to

25  get those breakdowns in place.  And we would, though, I think,

H69KDZHC

1    schedule them relatively close together.  That would be the way

2    that I've done it before, which actually works pretty well,

3    because if the case ends up narrowing significantly, which may

4    or may not happen, we then can collapse the trials into one.

5    So, that's what I've done before in very large cases and with

6    over 20 defendants, and we ended up with just a single trial.

7            So, that's what I think would be the initial plan of

8    action.  Other than setting those dates and hearing what I

9    understand will be one bail issue, is there anything else that

10   others who are not associated with the bail issue that I know I

11   have before me, which relates to just one defendant, is there

12   anything else people believe needs to be raised right now?

13   Just identify yourself.

14           MR. LAZZARO:  With respect to my client as far as

15   travel, Judge, she works in the upstate area and would like to

16   expand her ability to travel to work.

17           THE COURT:  Okay.  So, what I need is -- I don't

18   understand enough right now.  I don't have her piece from

19   probation because I didn't bring it out here with me to

20   understand about travel.  Let me just ask for a moment.

21           Does the government know --

22           Your client's name is Ms. Gaprindashvili?

23           MR. LAZZARO:  Yes.

24           THE COURT:  Does the government know enough about her

25   circumstances to be able to do this, and just tell me that

H69KDZHC

1    there's no objection?  If so, I have no reason to interfere

2    right now, but if you need to assess it, then what I would ask

3    is for you folks to get together, write me a letter.  If it's

4    on consent, that's easy.  If it's not, then I would ask for a

5    fuller presentation of your respective positions.

6              MR. ADAMS:  Your Honor, as phrased, there's an

7    objection, but I imagine we can come to an accommodation.

8              THE COURT:  Why don't you then try to come to an

9    accommodation.  Try to do that as quickly as possible since it

10    does relate to the defendant's work, which I assume is an

11    urgent relatively time sensitive issue.

12             MR. LAZZARO:  It is.

13             THE COURT:  But we do need to get that resolved.  I

14    can't do it on the fly without having the particular details in

15    front of me.

16             MR. LAZZARO:  I'll speak to the government.

17             THE COURT:  Terrific.

18             I will act on it as soon as I get something from you

19    folks.  So, if I get something from you folks this afternoon, I

20    will act on it.  I'll have my clerks call me because I do

21    understand it's an employment issue, and if you folks can come

22    to an agreement that allows the defendant to travel to her work

23    location, even if it's just point A to point B for this period

24    of time, until you work out a fuller agreement, I would be open

25    to that.  So, let me know.  I'll act on it immediately.

H69KDZHC

1

         MR. LAZZARO:  Thank you.

         THE COURT:  Ms. Sternheim.

         MS. STERNHEIM:  Yes, your Honor.  And this is with the
consent of the government that the travel restrictions for my
client, Mr. Mikheil Toradze, be extended for work purposes to
the District of New Jersey.

         THE COURT:  All right.  Mr. Adams, is that correct?

         MR. ADAMS:  No objection.

         THE COURT:  All right.  So, his bail term shall be so
modified to include the District of New Jersey.

         Is that a seven-day-a-week extension or a Monday
through Friday?

         MS. STERNHEIM:  Your Honor, the nature of his work is
deliveries, and there are times that there are weekends and
during the week.

         THE COURT:  All right.  So, there won't be a
particular date or time associated with that.

         Just identify yourself.

         Actually, she was standing up first, and then we'll
get to you.  I'm sorry.

         MS. NEWMAN:  I'm sorry.  Donna Newman.

         THE COURT:  Yes, Ms. Newman.

         MS. NEWMAN:  On behalf of Akaki Ubilava, I've spoken
to the government, also, about his expanding the travel
restrictions to include New Jersey and Upstate New York.  That,

1   however, was with the understanding that he would do so on

2   notice to pretrial, explaining where he's going -- the kind of

3   notice would include where he's going, when he's going, how

4   long he'll be there, and if for work, the work related to that.

5              THE COURT:  Okay.

6              MS. NEWMAN:  And with notice, also, obviously to the

7   government.

8              THE COURT:  That was Ms. Newman for Mr. Ubilava?

9              MS. NEWMAN:  Right.

10             THE COURT:  Is that agreed to, Mr. Adams?

11             MR. ADAMS:  Yes, it is.

12             THE COURT:  Okay.  Thank you.  Okay.

13             Then we've got Mr. Greenfield.

14             MR. GREENFIELD:  Yes, Judge.  My client is involved in

15   the same delivery service as Ms. Sternheim's client.  I was

16   going to make the same application to expand his bail

17   conditions.

18             THE COURT:  That's for Mr. Kanadashvili?  How do you

19   pronounce the name?

20             MR. GREENFIELD:  Kanadashvili.

21             I get the shvili better than the first part, but I'll

22   have it down.  Kanadashvili.

23             So, just for the District of New Jersey.  I have had

24   conversations with Mr. Adams before.  We were unable to

25   consent.  I assume if he agrees with Ms. Sternheim's client, he

1    would consent to my client.

2              THE COURT:  Yes.  I don't know the circumstances of

3    your client.  Let me ask Mr. Adams.

4              Mr. Adams?

5              MR. ADAMS:  We have no problem, your Honor.

6              THE COURT:  All right.

7              MR. GREENFIELD:  Thank you, Judge.

8              THE COURT:  So, the bail conditions for

9    Mr. Kanadashvili are also modified to include the District of

10   New Jersey.

11             Next, we have Mr. Waldron.  I'm sorry, not

12   Mr. Waldron, Mr. Levine.

13             MR. ADAMS:  I'm sorry, your Honor.  Before we move to

14   the next, just to clarify, Kanadashvili, that was District of

15   New Jersey for purposes of work only?

16             THE COURT:  For purposes of --

17             MR. GREENFIELD:  Work only?

18             THE COURT:  For purposes of work only.  It mirrors the

19   application of Ms. Sternheim, as I understand it.

20             MR. ADAMS:  Thank you, your Honor.

21             THE COURT:  Okay.  Mr. Levine, I think that

22   Ms. Kellman is also standing up.  So, somebody.

23             MS. KELLMAN:  Thank you, Judge.

24             Earlier this morning, Judge, I got an email from

25   pretrial services suggesting that the bail conditions -- my

H69KDZHC

1    client's bail conditions be tweaked a little bit.  I have no

2    objection to it.  I'm guessing the government has no objection.

3    We haven't had a chance to --

4              THE COURT:  This is for Mr. Davydov?

5              MS. KELLMAN:  Yes, your Honor.

6              THE COURT:  Is the government aware of the tweaking of

7    the bail conditions?

8              MR. ADAMS:  I have not seen any correspondence yet,

9    your Honor.  I'll speak with Ms. Kellman, and we'll get back

10   with you.

11             MS. KELLMAN:  I don't think you'll have any

12   difficulty.

13             THE COURT:  Submit them to me, and I will act on it

14   very quickly.

15             Mr. Levine.

16             MR. LEVINE:  Judge, I represent Mr. Petrushyn.  I want

17   to let your Honor know I wouldn't be able to appear on

18   September 8th.  I'll be attending a capital case seminar in Las

19   Vegas, but I'll have somebody stand in.

20             THE COURT:  All right.  So long as they have your

21   information about trial date and any discovery issues that you

22   may have.

23             MR. LEVINE:  Yes.  Thank you.

24             THE COURT:  All right.

25             Is there anything else?

H69KDZHC

1          Let's just take a five-minute break.  Let's have

2     everybody who does not need to be involved in the one bail

3     application that we're going to proceed with be able to leave.

4          Hold on a second, don't everybody get up because it

5     will create chaos with the hearing for the interpreters.  As

6     soon as I'm done talking, you can all stand up, otherwise they

7     won't be able to hear anything.

8          So, everybody can leave except for those individuals,

9     counsel, and parties who are necessary unless there's anything

10    else?

11         MR. ADAMS:  Your Honor, I just ask to exclude time to

12    September 8th, given the complexity of the case, the need to

13    review discovery, produce discovery, for defense counsel to

14    begin considering motions and possible dispositions.

15         THE COURT:  All right.  Is there any objection to a

16    request to exclude time between today and September 8th, 2017?

17         COUNSEL:  No.

18         THE COURT:  Hearing no objection, the Court does

19    prospectively exclude time between today and September 8th,

20    2017, to allow for counsel and their clients to get their arms

21    around this extremely voluminous discovery, to begin discussing

22    the various issues involved in this case and strategy, and to

23    also plan the beginnings of a motion schedule, that those

24    interests are in the interests of justice and outweigh the

25    interests of the defendants and the public in a speedy trial.

H69KDZHC

1    So, that time is prospectively excluded.

2            Mr. Oksenhendler, you're also standing?

3            MR. OKSENHENDLER:  Yes.  I'm the defense attorney that

4    is going --

5            THE COURT:  So, you'll stay with your client.

6            MR. OKSENHENDLER:  Can we have 15 minutes?

7            THE COURT:  It's going to be tough because I've got

8    something that I've got to get to that I'm already late for.

9    Do you need it for --

10           MR. OKSENHENDLER:  I'll deal with it.

11           THE COURT:  All right.  Let's just take a short break,

12   so that people can leave who don't need to be here, and I'll

13   see everybody who is going to be present for the bail

14   application in five minutes.  Thank you.

15                                    * * *

16

17

18

19

20

21

22

23

24

25