H69KKHUC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        17 CR 350 (KBF)

5   AVTANDIL KHURTSIDZE,

6              Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        June 9, 2017
9                                       1:53 p.m.

10
    Before:
11
                   HON. KATHERINE B. FORREST,
12
                                        District Judge
13

14                        APPEARANCES

15
    JOON H. KIM,
16       Acting United States Attorney for the
         Southern District of New York
17   ANDREW ADAMS
    ANDREW MARK THOMAS
18       Assistant United States Attorneys

19   GUY OKSENHENDLER
         Attorney for Defendant
20

21   ALSO PRESENT:

22   YANA AGOUREEV, Russian Interpreter
    MAYA BERIDZE, Georgian Interpreter
23   LASHA GEGECHKORI, Georgian Interpreter
    NASHAUN RICHARDS, FBI
24   ROBERT HANRATTY, FBI
    ERIN OTTERSON, FBI
25   BRUCE TURPIN, FBI
    ASHLEY COSME, Pretrial

1          (Case called)

2          THE COURT:  We need to have the defendant get the

3    earpiece on.

4          THE INTERPRETER:  He has it in his hands.

5          THE COURT:  He needs to put it on his head.

6          Can you hear?

7          THE DEFENDANT:  Yes.  Yes, I can hear.

8          THE COURT:  Can you hear now?

9          THE DEFENDANT:  As far as statements?

10          THE INTERPRETER:  I'll get --

11          THE COURT:  Yes, this happens from time to time.

12          Mr. Khurtsidze, can you hear now?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Terrific.  This is why I always make that

15    announcement to people at the very beginning of the proceeding,

16    because sometimes the equipment malfunctions, and the battery

17    runs out, things like that.

18          We are here, as I understand it, on an application by

19    the government relating to the terms of bail that the

20    magistrate set yesterday -- I believe it was yesterday -- for

21    Mr. Khurtsidze.  Is that correct?

22          MR. ADAMS:  That's correct, your Honor.

23          THE COURT:  All right.

24          Let me tell you what I have received in connection

25    with this application.  I have only received a copy of the

pretrial services report.  I have not received a written

application, which is fine, because we can do it orally, but I

want to make sure that you folks don't think you've given me

anything other than this report.

          MR. ADAMS:  No, your Honor.

          THE COURT:  Okay.

          So, it's the government's application, as I understand

it, Magistrate Judge -- was it Gorenstein?

          MR. ADAMS:  Yes.

          THE COURT:  -- has agreed to certain bail conditions.

So, why don't you --

          Joe, can you actually print it for me, that one?  Just

let me get the Manhattan's bail sheet.

          So, go ahead and tell me the application.  If you can

tell me, also, how things occurred yesterday, that would be

helpful, too, whether it was denied or whether the government's

has changed its position.

          MR. ADAMS:  No, your Honor.  Thank you.

          So, yes, it's our application that Mr. Khurtsidze be

detained pending trial, both on dangerousness grounds and on

the ground that he presents a substantial risk of flight.  We

made that application yesterday.  It was opposed by

Mr. Oksenhendler.  And Judge Gorenstein set bail conditions,

which included -- I think it's being printed now, but it was a

$200,000 bond secured, I think, only by $30,000 in cash or

1   property, four cosigners, and strict pretrial services with

2   home detention, although Judge Gorenstein modified that home

3   detention to some extent by allowing Mr. Khurtsidze to leave

4   home for purposes of training, and work, and then sort of

5   unspecified other reasons upon notice to pretrial, I believe,

6   but those weren't really named.

7            There were two presentations, both based on attorney

8   proffers yesterday, and the government ran through a proffer of

9   evidence, which I would like to do again today.  I can

10  supplement that to some extent based on some further

11  information, after talking with the agents, and

12  Mr. Oksenhendler also made a presentation prior to Judge

13  Gorenstein entering that order.

14           THE COURT:  Before you do that, can you tell me, just

15  so I have it in my mind, if there were particular things that

16  Judge Gorenstein said, apart from setting the terms, in

17  connection with the bail application that would assist me in

18  understanding why -- given the presentation that I am about to

19  hear and have expanded upon, why he determined it was

20  appropriate to set bail?

21           MR. ADAMS:  Sure.

22           THE COURT:  Now, I will also say, I'd love to have a

23  transcript, but as you folks know, in Magistrate's Court,

24  they're done by audio recording, it takes some time to get that

25  reduced to writing.  I have requested it, but it has to be sent

 1    out, and so I don't yet have it.

 2              So, why don't I just get a sense as to what you folks

 3    think was the basis for his rationale, and then we'll take it

 4    from there.

 5              MR. ADAMS:  So, Judge Gorenstein said explicitly that

 6    he did not believe the government had carried its burden with

 7    respect to showing a danger to the community, but did not

 8    elaborate on that.

 9              That being said, I think it's obvious he set the

10    conditions based on some view of risk of flight.  I don't

11    recall that he elaborated on that either.

12              THE COURT:  So, he thought that the -- obviously, he

13    thought the conditions for risk of flight could be met, but he

14    did not find that there was a risk of danger.  So, presumably,

15    he thought that there was a risk of flight, but that there were

16    certain conditions which could satisfy the standard?

17              MR. ADAMS:  I think that's right.

18              THE COURT:  Okay.

19              MR. OKSENHENDLER:  I would disagree with that to the

20    extent that he did not explicitly say that he was a risk of

21    flight.  He just imposed conditions to ensure that he would not

22    be able to, by turning over his passport and the strict

23    monitoring, but Magistrate Judge Gorenstein did say that the

24    government did not meet its burden with regard to danger to the

25    community.

H69KKHUC

1          THE COURT:  Okay.  Let me just ask both of you, before

2     we begin, so that we can understand whether there is a

3     disagreement on the legal principles that apply.  This is

4     governed by 18, U.S.C., 3142.  It's not a presumption case.

5     There are two standards, there are two bases for an application

6     for detention, which are separate.  They are separated by an

7     "or."  One is danger to the community, the other is risk of

8     flight.

9          The government has to first establish danger to the

10    community or risk of flight.  They do that by a preponderance

11    of the evidence, and then they have to establish whether there

12    are any conditions which could otherwise satisfy that.

13          MR. OKSENHENDLER:  I would agree with that.

14          THE COURT:  So, Mr. Oksenhendler is agreeing with

15    that.

16          MR. OKSENHENDLER:  And, of course, under 3142(g),

17    there are the factors we have to consider.

18          THE COURT:  Right.  I'm looking at the Sabhnani case,

19    493 F.3d 63 (2d Cir. 2007).  If the government wants to carry

20    the first portion of the burden by clear and convincing, if it

21    wants to try to do that, just tell me what you're going to try

22    to do and --

23          MR. ADAMS:  We'll satisfy it, even clear and

24    convincing.

25          THE COURT:  Okay.  Let's figure out if you need to go

H69KKHUC

1    that far.

2          MR. ADAMS:  That's right.

3          THE COURT:  Let me also say, while you're looking for

4    that, while Mr. Thomas is looking for that, as I understand,

5    one of the issues is that the defendant, I understand, is a

6    professional sportsman, that's his career, and --

7          MR. OKSENHENDLER:  Yes, Judge.

8          THE COURT:  -- he has some significant event for which

9    he's training at the moment that is upcoming in July.

10          MR. OKSENHENDLER:  Your Honor, there was supposed to

11    be a world championship middleweight title fight that my client

12    is --

13          THE COURT:  He's a boxer?

14          MR. OKSENHENDLER:  Yes.  It was supposed to take place

15    in London on July 8th.  Due to the arrest, that bout has been

16    put on hold.  It's been all over the newspapers around the

17    world.

18          THE COURT:  I see.  So, that's already been put on

19    hold?

20          MR. OKSENHENDLER:  By the powers that be with regard

21    to the boxing world.

22          THE COURT:  All right.  So, the detention, or lack of

23    detention, that's not going to, at this point in time, impact

24    that.  That sounds like the boxing authorities have already

25    taken that off calendar because of the arrest?

H69KKHUC

1      MR. OKSENHENDLER:  Because of the arrest, and they

2      didn't know what was going to happen, from what I understand.

3      THE COURT:  Do you have any reason to believe that the

4      boxing world would put it back on if he was released, or do you

5      just hope they would, but have no idea?

6      MR. OKSENHENDLER:  I am not sure, your Honor.  We were

7      in court yesterday until about 7:00 o'clock, at which time we

8      found that we had to appear today.  I didn't even get notice

9      from the government that they intended to appeal the bail, so

10     to speak, to you today, and I did not have a chance to speak to

11     his management team with regard to how they would like to

12     proceed, but, obviously, nothing can happen if he's detained,

13     but there is every reason why he should receive bail in this

14     case.

15     THE COURT:  All right.

16     So, let's go ahead and let's turn -- do you have the

17     standard?

18     MR. ADAMS:  For the dangerousness prong, it's clear

19     and convincing for risk of flight, it's preponderance.

20     THE COURT:  So danger prong, clear and convincing.

21     Risk of flight, preponderance.  And then the standards and all

22     events are preponderance?

23     MR. ADAMS:  Correct.

24     THE COURT:  Okay.  Go ahead.

25     MR. ADAMS:  So, your Honor, we're moving under both

1    prongs, both dangerousnesses and risk of flight, as we did

2    yesterday.  I've spoken a little bit today about the nature of

3    the evidence, but with leave from the Court, I'll speak a

4    little more with respect to this defendant in particular.

5            THE COURT:  Yes, that's what I'm most interested in

6    for this application.

7            MR. ADAMS:  So, the evidence that I'm going to be

8    talking about is on video.  It is corroborated not only by the

9    fact that it's on video, but there are, in two of the instances

10   that I'm going to be talking about, a confidential source who

11   can talk about this, these incidents, recordings, audio

12   recordings with respect to one incident that I'm going to be

13   talking about, wiretap evidence that corroborates one of these

14   events, all of which is to say that the evidence of this

15   defendant's dangerousness and the violence he has inflicted on

16   behalf of this enterprise is overwhelming.

17           That goes not only to establishing beyond clear and

18   convincing evidence that he does pose a danger, but it also

19   informs on risk of flight because this is a case that if it

20   goes to trial, will result in a conviction and significant

21   penalties.  The events that I'm talking about revolve around

22   the poker house and the extortion scheme that I was discussing

23   earlier.

24           The poker house is geared with a surveillance system,

25   as we discussed.  We had video access to the surveillance

H69KKHUC

system, at least as of a certain period of time, and three of the events I'm going to describe occurred in the poker house.

Event number one has to do with an assault on a lower-level member of the Shulaya enterprise.  It's actually somebody who's charged in the case itself, Mr. Chaganava, who is a defendant in the case.  He was, early on in the investigation, somebody who was identified as a Shulaya underling.  He was somebody who helped arrange for the sales of stolen goods and fencing of stolen goods.  He had a key role in the cigarette scheme at one point.  It's our understanding that something went wrong with respect to Mr. Chaganava paying tribute or paying with respect to Shulaya.  As a result, Mr. Chaganava was beaten badly.

THE COURT:  This is on videotape?

MR. ADAMS:  This one is not.  The other two will be.

THE COURT:  I'm sorry, tell me what year this was?

MR. ADAMS:  The beating was in 2016.

THE COURT:  All right.  Okay.  So, tell me about the other two.

MR. ADAMS:  The other two -- well, just to wrap up on that one, the confidential source is not actually there present while the beating is happening, but Mr. Khurtsidze, who we'll talk about more, is there, Shulaya is there, and other members of sort of the muscle side of the enterprise are in the poker house.  The confidential source is actually sent to go get ice

for Mr. Chaganava, who is badly beaten during this encounter.
And given the other circumstances that I'm going to be talking
about, I think it is a safe surmise here that Mr. Khurtsidze
was if not the person beating him, at least somebody there to
ensure that he didn't move while it happened.

The other two incidents in the poker house are on
video.  We don't have full visibility into the reasons why this
happened, but Mr. Khurtsidze assaults and punches someone who
is associated with Mr. Vinokurov, who is another Shulaya
enterprise member.  He was here earlier today.  The victim
there is not a defendant in this case, and because we don't
have audio, we don't know exactly what transpired with
Mr. Khurtsidze, who is a professional fighter and not someone
from whom a punch is a small thing, punched this person in the
poker house.

Which leads me to the third incident, which we have
not only on video, but also on audio.  The audio was obtained
from the confidential source, who was the victim of this
assault.  The background is one of the larger poker games that
the Shulaya enterprise put together.  There was a lot of money
involved.  For almost 24 hours, the game ran.  The confidential
source was there acting sort of as a manager and a worker for
the poker house during the game, and he was accused at the end
of all of this of having pocketed some money that belonged to
the enterprise as a result of the break from what the house had

1    earned from the poker game.

2            He was summoned to the poker house in circumstances

3    that looked just like Mr. Chaganava.  It looked just like this

4    second assault that I just mentioned.  He sat down at the

5    table, he was berated for a little while for having or being

6    accused of having stolen goods or stolen money from the game,

7    and then two things happened, both of which are crystal clear

8    on tape.

9            The first is that Mr. Khurtsidze, at the apparent

10   direction of Shulaya, who's doing most of the talking and

11   berating, stands up and punches the CS in the face with extreme

12   force.  Shulaya then seconds that by basically slapping the CS

13   around for a little while and threatening him that he had

14   better pay up or there will be further punishment to come.  The

15   CS, fortunately, made it out of the poker house on that day,

16   had the recording, provided the audio recording of the same

17   event that goes with the video.

18            THE COURT:  What year was that?

19            MR. ADAMS:  That was last year as well.

20            THE COURT:  And the second one, which is the on-video,

21   but no audio, that was also 2 -- these are, all three, in 2016?

22            MR. ADAMS:  Correct, your Honor.

23            THE COURT:  All right.  And did Judge Gorenstein know

24   about all three of these yesterday?

25            MR. ADAMS:  The second one, the assault on --

1      actually, the first two that I mentioned, from speaking with

2      the agents and the source who learned that Mr. Khurtsidze was

3      there for when Chaganava was being beaten, although we don't

4      know by whom because the source wasn't looking at that or

5      wasn't in the room when it happened, and the second one, the

6      assault of Mr. Vinokurov, was something that I wasn't aware of

7      until today.

8              THE COURT:  Okay.

9              MR. ADAMS:  The third incident, the agents brought to

10     my attention last night after the arguments.  Judge Gorenstein

11     was not aware of this final thing, although he was generally

12     made aware that Mr. Khurtsidze was sent out to help extort and

13     intimidate debtors.  We did make that very clear yesterday.

14             THE COURT:  That, in the government's view was the --

15     you have evidence to support that that was the role?

16             MR. ADAMS:  That one of his roles --

17             THE COURT:  For sure, Mr. Oksenhendler, I'm going to

18     give you a full chance to rebut everything.

19             MR. OKSENHENDLER:  Sure.  Thank you, Judge.

20             THE COURT:  All right.

21             MR. ADAMS:  That he was a part of crews that went to

22     speak to debtors.  What I didn't appreciate was that one of

23     those instances is actually recorded because the confidential

24     source was there, and a threat was made by Mr. Khurtsidze, in

25     his words, to threaten the debtor.  That was also --

H69KKHUC

1          THE COURT:  Threaten the debtor with violence or with

2     other action?

3          MR. ADAMS:  So, this is not made explicit.  There's

4     nothing on the recording that says I'm going to come and beat

5     you, or kill you, or anything like that.  You're going to have

6     problems is about the extent.

7          THE COURT:  You better pay up or you're going to have

8     problems.

9          MR. ADAMS:  But in the context of what I've just

10    discussed, that's crystal clear what that means.

11         THE COURT:  What year was that?

12         MR. ADAMS:  Last year as well, your Honor.

13         THE COURT:  All right.

14         MR. ADAMS:  Those are four instances of violence or

15    threatened violence on behalf of the Shulaya enterprise.

16         THE COURT:  When you said that he was part of the crew

17    that would go out and -- and I'm going to characterize what you

18    said -- acted as an enforcer of debts, do you have anything

19    more than this one instance?  Is there other evidence, even if

20    it's not particular evidence, of where you've got an audiotape

21    or something like that of a threat, or is that the evidence for

22    the enforcer role?

23         MR. ADAMS:  No, there are other incidents where he

24    goes out, two other incidents where he goes out, to talk to

25    other debtors.  And there's also a conversation, I should

1    mention, between the source and Mr. Dzhanashvili, who was one

2    of the key lieutenants of the Shulaya enterprise and was

3    present for the beating of the confidential source I mentioned

4    earlier, during which in a conversation about somebody who owed

5    money to the poker side of the Shulaya enterprise, Dzhanashvili

6    essentially says, you know, take the kickboxer with you, and we

7    understood that to be a reference to this defendant.

8              THE COURT:  All right.

9              MR. ADAMS:  This is a group, generally, that is feared

10   by not only the community that has to deal with them, but by

11   people within the enterprise itself.  Mr. Toradze, who was here

12   earlier and was also a member of the contraband cigarette

13   scheme, is on a phone call with Shulaya at one point where

14   Shulaya is making reference to the beating of Chaganava in an

15   effort to threaten Mr. Toradze, who apparently had some sort of

16   falling-out with Shulaya as well or seemed to have upset

17   Shulaya at one point.

18             So, it's exactly this kind of violence that made the

19   Shulaya enterprise effective at keeping its people in check.

20   It's what allowed them to use the poker house, which was

21   essentially a room above a restaurant, and allowed them to move

22   into that at will.  There are other allegations in the

23   indictment of essentially extortion or the exploitation of

24   different businesses and businesspeople.  This is not possible

25   unless people are quiet about what the Shulaya enterprise does,

H69KKHUC

1    and people are not quiet unless there's a credible threat of

2    violence.  This defendant provides the credible threat of

3    violence.

4              THE COURT:  All right.  So, why don't we turn, then,

5    to risk of flight.  Why don't you tick through the issues, and

6    I'll ask you to sort of tick through them a little more

7    quickly.

8              MR. ADAMS:  Sure.

9              The pretrial services report makes a lot of the points

10   that I would like to make about flight.  No fixed address after

11   he moved out of Brooklyn.  He's offered essentially to stay in

12   a hotel if he were to leave.  He apparently has no real ties to

13   the community other than, I would suggest, the ties that form

14   the basis of this indictment.  He was in Georgia as recently as

15   Wednesday.

16             THE COURT:  Georgia, the country, not the state of the

17   United States?

18             MR. ADAMS:  That's correct, your Honor.

19             THE COURT:  So the record's clear.

20             MR. ADAMS:  Thank you.

21             THE COURT:  All right.

22             MR. ADAMS:  He boarded a flight -- and this is

23   actually, I think, important, and it's a point that I didn't

24   make in front of --

25             THE COURT:  That's okay.  I just wanted to make sure

H69KKHUC

1    that she is able to catch up with you.

2            THE INTERPRETER:  Sorry.

3            THE COURT:  Don't worry about it.  It's not a problem.

4            So, let's go back to he was in Georgia as recently as?

5            MR. ADAMS:  Wednesday.  He boarded a flight hours

6    before the key parts of the arrest in this case started

7    unfolding.  There were two people arrested the evening before

8    he got on the flight.  That was Mr. Marat-Uulu and the person

9    who's charged in the complaint with Mr. Marat-Uulu, who's

10   Nikoloz Jikia.  There is no known connection between those two

11   defendants and this defendant other than their activities

12   generally with the enterprise, which is just to say, their

13   arrest is not something that he would likely have been aware

14   of.  But I say this to make the point that it's not as if he

15   came back to the United States knowing he was going to be

16   arrested.  This was a surprise when he landed.

17           The other point here is that he has deep ties to

18   Georgia, he has deep ties to the Ukraine, children there,

19   family there, none here.  He has been there as recently as this

20   week.  He has substantial assets in that country.  He has

21   liquid assets only here, meaning he has a bank account, which

22   he could access if he went to Europe, a Bank of America

23   account, I think, is what he said or represented to Judge

24   Gorenstein, in which he has $60,000 available.  But the main

25   asset that he lists in the pretrial report is a $200,000 asset

H69KKHUC

1   in Georgia.

2           In addition, he is not somebody whose livelihood

3   depends on being in the United States.  He's a prize fighter.

4   The fight that Mr. Oksenhendler referred to earlier is not in

5   the United States, it was in London, or supposed to be in

6   London.  He does not need to be clear in the United States,

7   certainly not in this district, in order to make plenty of

8   money and live very comfortably in the country where he already

9   has a $200,000 asset.

10          He is a member of an enterprise -- although he himself

11  is not someone from whom false identifications were seized or

12  someone who we are accusing at this point of having gone out on

13  the false credit card scam, he is a member and associate of an

14  enterprise where that sort of material is readily available on

15  the cheap and at a moment's notice, frankly, given what we know

16  from the wiretap intercepts from some of his codefendants.

17          THE COURT:  Let me ask you where this fell within the

18  array of presentments and bail applications that Judge

19  Gorenstein listened to yesterday.  Were you arguing this in the

20  beginning, the middle, or the end of what must have been a very

21  long day?

22          MR. ADAMS:  This was actually the second day, and this

23  was the very last thing that happened in front of Judge

24  Gorenstein.

25          THE COURT:  So, it was the last thing?

H69KKHUC

1          MR. ADAMS:  The very last thing.  Before this --

2          THE COURT:  What time was it?

3          MR. ADAMS:  He was presented at approximately

4   5:00 o'clock yesterday.

5          THE COURT:  All right.

6          MR. ADAMS:  And this was not in a string of lots of

7   people.  Wednesday was the main presentment.

8          THE COURT:  So, this was on its own?

9          MR. ADAMS:  Yes.  And on Wednesday, there were

10  essentially no -- there was one bail argument on a minor point

11  with respect to Mr. Buziashvili, not with respect to detention

12  but a fight about the conditions of release.

13          THE COURT:  I understand your position.  Let me just

14  turn to Mr. Oksenhendler and hear from him.

15          MR. OKSENHENDLER:  Yes, your Honor.  I first would

16  like to point out that there is one mistake in the report that

17  was handed to you.  On page 2, in the last paragraph, it said

18  this year my client made approximately $200,000.  What was

19  represented in court yesterday was that were he to win the

20  July 8th fight, his payment would be $200,000.

21          THE COURT:  I see.  Okay.

22          MR. OKSENHENDLER:  He has not made $200,000 this year.

23          THE COURT:  How much has he made this year?

24          MR. OKSENHENDLER:  I think he said he had made -- I

25  think it was approximately $50,000 this year --

H69KKHUC

```
 1                THE COURT:  Okay.

 2                MR. OKSENHENDLER:  -- part of which goes to his

 3    management team, his trainers, to pay for his expenses.

 4                THE COURT:  Are you retained?

 5                MR. OKSENHENDLER:  No, your Honor.  I'm appointed.

 6                THE COURT:  You're CJA?

 7                MR. OKSENHENDLER:  Yes, your Honor.

 8                The assets that he has --

 9                THE COURT:  Let me just ask one question.  We'll get

10    to the bottom of the $200,000.  That number came from your

11    client to pretrial?

12                MR. OKSENHENDLER:  I think it was part of my

13    presentation to the Court when the judge asked how much would

14    he make from the fight that's upcoming.

15                THE COURT:  It's not that your client told pretrial

16    that he had made $200,000 this year?

17                MR. OKSENHENDLER:  That's correct.

18                MS. COSME:  Your Honor, I interviewed the defendant,

19    and from my understanding, that's what he said, that to date

20    for this year, 2017, he had made $200,000.

21                THE COURT:  And you interviewed the defendant?

22                MS. COSME:  Yes.

23                THE COURT:  In any event --

24                MR. OKSENHENDLER:  I read the report.  I don't think

25    that was -- that's what it said, but --
```

H69KKHUC

1            THE COURT:  I understand.

2            MR. OKSENHENDLER:  -- my representation to the Court

3    was that --

4            THE COURT:  He might be able to make another $200,000.

5    I mean, it's a world championship.

6            MR. OKSENHENDLER:  That's right.  But he only had one

7    other fight this year, and it was not a title type fight.

8            THE COURT:  Okay.

9            MR. OKSENHENDLER:  With regard to your inquiry about

10   when -- we had the presentment yesterday.  Judge Gorenstein was

11   not tired, it wasn't at the end of the day, he wasn't

12   exhausted.  He was very -- he was keen to ask the right

13   questions in coming to a very reasoned decision that bail

14   should be set in this case.

15           THE COURT:  So, tell me how he got over the assaults.

16           MR. OKSENHENDLER:  Well, with regard to the first

17   one --

18           THE COURT:  Let's just take them --

19           MR. OKSENHENDLER:  -- on the codefendant, the

20   government isn't even sure that my client was present or a

21   participant in that assault.

22           THE COURT:  Is the evidence on that weak, that he was

23   present?

24           MR. ADAMS:  The evidence that he was present is not

25   weak.  The evidence that any particular person actually struck,

H69KKHUC

1    we have no evidence --

2            THE COURT:  You know he was present, and that's it?

3            MR. ADAMS:  Sure.

4            THE COURT:  For sure.

5            MR. OKSENHENDLER:  But present in a large facility

6    where something is going on or he was present in the room

7    where --

8            THE COURT:  Let me find out.

9            Is the government going to make a proffer he was

10   present in the room or in the poker establishment?

11           MR. ADAMS:  The room.  There's very little difference

12   between those two things, it's not a big establishment, but the

13   room --

14           THE COURT:  Is this room huge?  Could it have been

15   from here across the room full of people, or was it the kind of

16   thing where if you're in the room, you're seeing what's going

17   on in the room?

18           MR. ADAMS:  Based on my experience of other judges'

19   robing rooms, it's approximately the size of a robing room.

20           THE COURT:  All right.

21           MR. OKSENHENDLER:  I still don't understand how merely

22   being present --

23           THE COURT:  No, but the factual proffer is only that

24   he was present during an assault at least.  He was at least

25   present during an assault.  So, let's go to the second.

H69KKHUC

1        MR. OKSENHENDLER:  The second where the government

2   admitted here is that he doesn't know exactly what transpired.

3   So, although there's a video with some kind of scuffle,

4   although I have not seen the video, who knows what caused that

5   incident, that alleged incident, to occur.

6        THE COURT:  So, let me just ask:  Does it look like

7   self-defense?  Did the other individual throw a punch?  Move

8   upon the defendant?  Get in his face?

9        MR. OKSENHENDLER:  Did he bait my client?

10       THE COURT:  I won't know the oral part of it, so --

11  one way or the other, but at least I'll know visually whether

12  or not there's an altercation.  Was he in his face moving up on

13  him, you know, closing in?

14       MR. ADAMS:  Just one moment, your Honor.  I want to

15  speak correctly.

16       THE COURT:  Yes.

17       (Pause)

18       THE COURT:  Just for the record, just so it's clear,

19  the counsel is talking to one of the agents involved.  I take

20  it that the agent has actually seen the videotape with his own

21  eyes.

22       MR. RICHARDS:  Yes.

23       THE COURT:  So, you've got a report from an agent

24  who's here.  So, tell me what --

25       MR. OKSENHENDLER:  Can I get the agent's name?

H69KKHUC

| | |
|---|---|
| 1 | THE COURT:  Yes. |
| 2 | MR. RICHARDS:  Nashaun Richards. |
| 3 | MR. OKSENHENDLER:  Thank you, Judge. |
| 4 | MR. ADAMS:  Thank you, Judge.  I was clarifying which |
| 5 | of the two video assaults I was recalling the fact from. |
| 6 | With respect to the one that Mr. Oksenhendler is |
| 7 | referring to right now, where the CS is not the victim, it's |
| 8 | clear that it's not self-defense.  The guy doesn't throw a |
| 9 | punch first.  And in light of that, and in light of some other |
| 10 | facts with respect to the assault on the CS, I think it's |
| 11 | easily understood that it is an assault, again, on a |
| 12 | lower-level member of the enterprise to enforce the |
| 13 | enterprise's power. |
| 14 | With respect to the third assault on the CS, the CS |
| 15 | has made a stand at attention while he gets punched by this |
| 16 | defendant and by Shulaya. |
| 17 | MR. OKSENHENDLER:  It sounds, based on what was |
| 18 | represented by the government, that they're guessing as to what |
| 19 | happened with the second assault, that they don't know what |
| 20 | actually happened or what was the precursor to some type of |
| 21 | incident or alleged incident.  There is no video. |
| 22 | MR. ADAMS:  There is. |
| 23 | THE COURT:  There's a video of both, no audio. |
| 24 | MR. OKSENHENDLER:  No audio, I meant to say, Judge. |
| 25 | Unfortunately, my client is a world-class fighter.  It |

1    struck me last night, after hearing the government's arguments

2    made to the Court, I remember an incident where Mike Tyson was

3    out one night when he was the world champion, he was out

4    Uptown, and another boxer named Mitch Green baited him into

5    having some kind of fight on the street.  Unfortunately, when

6    you are a successful athlete, sometimes people want to be

7    around you, sometimes people have too much to drink and mouth

8    off.  We don't know the circumstances without any audio

9    understanding of what was said and what transpired beforehand

10   to have any context as to what is seen on the videotape.

11        With regard to the third incident, although I haven't

12   seen the videotape or heard the audio, again, I don't know the

13   circumstances, although the government was willing to somewhat

14   mislead the Court yesterday with another piece of evidence

15   which they didn't raise today.  In court yesterday, the

16   government proffered that my client was a critical participant

17   in the wire fraud because he was the one who allegedly moved

18   some electronic equipment from one place to another.  It wasn't

19   that he was there as protection, or muscle, or was armed, or

20   anything, and that this electronic equipment was so critical to

21   anything, but the fact that he moved it, he was the only one

22   who could physically move it.  And that's clearly a

23   misleading --

24        THE COURT:  Well, they haven't done that.  They've

25   haven't repeated it today.

1          MR. OKSENHENDLER:  I understand, but they were willing

2     to try and enflame the decision-maker here as to what his

3     participation is, and I think they overstated their case

4     against him yesterday.  And the whole point, also, was, they

5     didn't bring that up again today because it was a losing

6     argument.

7          I don't know the circumstances about the third

8     assault, but assuming for the moment --

9          THE COURT:  How about the audiotape, the audiotape

10    where he threatens somebody, the fourth incident, and that sort

11    of feeds into the government's argument that he will be shown

12    through the evidence to be among the muscle or the enforcement

13    of the crew?

14         MR. OKSENHENDLER:  Well, the government described it

15    as my client making an alleged statement that you'll have

16    problems.  You know, without understanding the inflexion of the

17    speaker, the circumstances in which that statement is made, it

18    could very well be advice to someone like, hey, man, you should

19    really pay that guy back because otherwise you're going to have

20    some problems.  There are very different ways to interpret

21    those words based on the circumstances.  I haven't had a chance

22    to listen to that audio recording.  Again, I'm here not even 24

23    hours on the case, and I understand the government is doing

24    good work, and they're representing their client well, but I

25    have to do the same.  And I don't have the benefit of listening

1     to this evidence.

2             But to reach a clear and convincing standard, they

3     have not yet met that burden, in my opinion.

4             THE COURT:  How about on the risk of flight?  Even if

5     you were to argue no danger to the community, and you had

6     somebody where they were a pacifist, right, would you agree

7     with me that, as a matter of law, if there was a sufficient

8     risk of flight, that would be, in and of itself, enough?

9             MR. OKSENHENDLER:  Of course, your Honor.  However,

10    based on this matter, there are conditions that can be met

11    which would alleviate any concerns the Court would have.

12    Number one, in my argument to the Court yesterday, I made no

13    argument availing myself to the fact that my client wanted to

14    fly to London to fight in the scheduled fight.  My client has a

15    contract with a New York boxing promoter.  His contract is here

16    in the United States.  That's why he's here.

17            THE COURT:  So, the bout, though, is a London bout?

18            MR. OKSENHENDLER:  Yes, but, obviously, that's off for

19    now.  And we haven't even talked about -- we hadn't even

20    thought about asking him if he would leave the country.  Right

21    now, all we want to do is get him home.

22            THE COURT:  But I don't even have a home.  Is it the

23    case he doesn't have an apartment, he can go live in a hotel?

24            MR. OKSENHENDLER:  When asked -- my client has never

25    been arrested before.  He's never been charged with a crime.

H69KKHUC

1    He's not a kid, he's a 37-year-old man.  So, this isn't a case

2    where he's arrested, it's the first time, but he's a young man,

3    so he would have plenty of more chances to get arrested again.

4    This is a man who's lived 37 years and has never gotten into

5    any trouble with law enforcement.  He does not have an address.

6    He did previously have an address in Brooklyn.  And Magistrate

7    Gorenstein said if he does meet the conditions, he's going to

8    have to explain to pretrial and before he's released, he would

9    have to have an address.

10          We have -- they left.  There were about four or five

11   friends that were here last night, who I met with.  There were

12   other people here earlier.  I don't know if they understood

13   that it was going to be us arguing this over, but we're going

14   to meet at the beginning of the week to find out about

15   suretors, and they said they would find a permanent place for

16   him to stay should he be released.

17          So, one of the conditions for his release was that he

18   would.

19          MR. DONALDSON:  Excuse me, Judge.  If I may interrupt.

20          THE COURT:  Mr. Donaldson?

21          MR. DONALDSON:  I think the people he's speaking about

22   are standing right outside the door.  They asked me --

23          THE COURT:  I don't need them to testify, but thank

24   you for that information.  They haven't left, they're there --

25          MR. DONALDSON:  No.  They're outside the door.

1          MR. OKSENHENDLER:   Thank you.

2          So, he would have an address, and as far as we're

3     concerned, if that's a condition the Court needs met, so be it,

4     we will have an apartment that he can live in where he can be

5     monitored.

6          THE COURT:   It certainly is unusual to release

7     somebody with a serious risk of flight concern who doesn't have

8     an address, but let me ask you about the attachment to this

9     country.

10          It's significant that, as I understand it, he has a

11     small child in Georgia, overseas, and his parents and his

12     siblings are all -- in fact, his whole family, everybody, it

13     might be fair to say, is overseas, and he owns real estate and

14     has a bank account, all also overseas.  Are those things

15     correct?

16          MR. OKSENHENDLER:   That is correct.  However, that

17     should not preclude him from being released on bail in this

18     case.  He can have an apartment here with friends where he can

19     live.  Despite the fact that he has ties to the Nation of

20     Georgia, he also has a professional obligation where he is

21     under contract here in the United States and in New York City.

22     So, his ability to fight is based on him satisfying his

23     obligations to his contract here in the United States.

24          THE COURT:   All right, I hear what you're saying.

25     You're saying that his desire to satisfy his contract here in

1    the United States is a very significant motivation for him.

2             MR. OKSENHENDLER:  That's his only way to make money.

3    That's how he makes money.  If he goes to Georgia, he can't

4    fight.  He can't leave and fight because he would be violating

5    his contract.  No one would take the fight with him because

6    they would be sued by his management company.

7             THE COURT:  Do we know that he actually has -- whether

8    there's any life left in the contract?  In other words --

9             MR. OKSENHENDLER:  One year on his three-year

10   contract.

11            THE COURT:  No.  What I mean is that they have already

12   canceled the bout for London, so if they canceled the bout for

13   London, the contract may or may not have any umph left in it.

14            MR. OKSENHENDLER:  I think it was postponed.  I read

15   about this in all the international papers this morning on my

16   way in, is the only way I learned about this.  But we're

17   willing to have monitoring, strict pretrial conditions.

18            There's another argument that wasn't made by the

19   government, that he was collecting huge sums of money for this

20   alleged organization, that he was pounding the streets.  It

21   seems that they cherrypicked three incidents, which probably

22   are completely unrelated, to try and paint a picture of someone

23   who's an enforcer when we adamantly deny those allegations.

24            THE COURT:  Let me just ask about the relationship.

25   Am I correct in understanding that all three of the incidents

1    occurred inside the poker house?

2              MR. ADAMS:  That is correct.

3              MR. OKSENHENDLER:  That may be the common thread, but

4    the motivation for each of those incidents isn't apparent, and

5    it isn't apparent that they're related.

6              With regard to the first one, we deny it.  And with

7    regard to the government's characterizations of the second two

8    incidents, we disagree with their characterizations.

9              But getting back to risk of flight:  My client has a

10   Georgia passport, which was seized at the time of his arrest.

11   So, without that passport, he would not be able to exit the

12   United States.

13             He has respect for this Court and for the rule of law.

14   We've discussed that.  He said he would never, ever run.  He

15   has no history of any ties or contacts with the criminal

16   justice system, and he has no history of running afoul of any

17   court orders.

18             He has never been in violation, from what I have been

19   able to learn, of any drug testing rules within the boxing

20   world.  There's no allegation here that he was abusing drugs,

21   and he's never used drugs, he doesn't drink alcohol.  And I

22   believe he took a drug test.  I would bet my bottom dollar it

23   comes up negative.

24             He's a peaceful man, he's a warrior in the ring.  He's

25   a well-known entity in his community and in the larger boxing

H69KKHUC

1    world.  People tend to gravitate toward him because of his

2    world-renowned skills as a fighter.

3            THE COURT:  Let's talk about timing for a moment.

4            You said you were going to be talking to people next

5    week about bonds or signing?

6            MR. OKSENHENDLER:  Yes.  There were -- all four or

7    five people that were here last night wanted to help.  One

8    woman, who's a dear friend of his, expressed her dismay at

9    perhaps not being able to help because she's not working right

10   now, she just had her second child, but there are people that

11   really care about him.  Although his family is in Georgia, his

12   second family is here in the United States.  His trainer is

13   here, his promotion team is here, his manager is here, and he

14   has an awful lot of friends here.  And sometimes family is

15   where you find it.  He's doing what he has to do here, so that

16   he can take care of his family.

17           THE COURT:  All right.

18           Are there any other facts that I should be aware of on

19   either side as opposed to just argument?

20           MR. OKSENHENDLER:  No, your Honor.

21           MR. ADAMS:  Well, since Mr. Oksenhendler mentioned

22   that there are things that I said yesterday that I didn't say

23   today, let me make sure that I say everything that I said

24   yesterday, although I think that the main gist of the

25   dangerousness argument lies in the assaults we've talked about

1   already.

2          Mr. Khurtsidze was accused by an ex-girlfriend of a

3   domestic violence incident in March of this year in which her

4   hand was broken.  The NYPD had lodged an i-card on that.  There

5   is no charge or conviction.  But I said it yesterday, I'm

6   saying it again today.

7          And with respect to the casino scheme, that was

8   certainly something that we talked about earlier.  Yes, he was

9   involved in -- basically at Shulaya's direction, whenever

10  Shulaya asked for it, to come and provide the muscle to move

11  around these sample slot machines.

12          THE COURT:  All right.

13          MR. OKSENHENDLER:  Can I just add one fact?

14          THE COURT:  Yes.

15          MR. OKSENHENDLER:  With regard to this DV incident, I

16  think it's much ado about nothing.  My client has been in the

17  United States for much of the period since that incident

18  allegedly happened.  The NYPD clearly would have been able to

19  find him if they wanted to, and they've taken no action.  An

20  i-card is a warrant without a warrant.  It just allows -- I'm

21  sure you're familiar with it.  It just allows the police to say

22  we're interested in talking to you, and we're going to arrest

23  you, but because we don't have a warrant, we don't have to tell

24  you that you have the right to remain silent.

25          THE COURT:  All right.  In any event, I thank you both

H69KKHUC

1    for the factual information that's been provided to the Court.

2    I don't need to rely on the alleged domestic violence incident

3    to arrive at the following determination:

4         I am going to reverse Judge Gorenstein's bail

5    determination.  I find that it is actually not a difficult

6    decision at all, based upon the current record.  I think that

7    there is certainly, in the Court's view, under 3142 and the

8    factors under 3142, a very clear case of a danger to the

9    community here.  We've got an individual where there is both

10   testimony, and we've got two videotapes, and one of them has

11   audio of him actually committing violence in the central

12   location where this enterprise had its main operations.

13        I find it very important, and to my view as to the

14   context of those assaults, that it occurred there, and that the

15   defendant has been indicted for offenses relating to his work

16   on behalf of the enterprise that was operating out of those

17   premises.  Therefore, I think it is not really a difficult step

18   at all for the Court to find that the assault, number one,

19   where he was present, was an assault that was at the very least

20   known to him, and that was known to have occurred there.  And

21   there is, of course, then the second assault, where we don't

22   know all of the facts and circumstances; we do know, at least

23   based upon the government's proffer, it does not appear there

24   is any self-defense involved.  And as for the third assault, we

25   know, quite clearly, what happened there because of the

H69KKKHUC

audiotape, and that is a very disturbing event that, of course,

I think properly colors the Court's view as to the defendant's

position with regard to the others.

In addition, we also have audiotapes of the defendant

acting at least as a verbal enforcer.  I think that it is a

very fair inference to draw that the type of conversation of

"you will have problems" coming from an individual associated,

at the very least, with this kind of enterprise, which enforces

its rules and its requirements through violence or through the

threats of violence, that those statements carry a lot of

weight.  And, therefore, the fact that we have one audiotape --

the government proffers it has one audiotape -- of a threat is

highly significant to the Court, and that there are going to be

two other instances at least where there will be evidence to

show that this was not an isolated occurrence, that is highly

significant to the Court as well.

So, based upon the Court's view as to the defendant's

role, it does appear to the Court that, while he may have

played a number of roles in this scheme, it is quite clear to

me that there were assaults involved, and we are talking about

assaults not involved in a crime that was otherwise a

nonviolent crime, but in a very extensive, sweeping, as

charged, enterprise.  So, the risk of a danger to the

community, in that kind of situation, is very significant

indeed.

1          So, I have actually no problem finding that, as a

2     factual matter, the government has carried its burden of

3     showing by clear and convincing evidence that the defendant

4     poses a danger to the community.

5          What I would suggest is this:  We'll talk about risk

6     of flight in a moment, but on the violence, once

7     Mr. Oksenhendler has an opportunity to review the videos and to

8     review the audiotapes himself -- I understand they're in a

9     foreign language, but tone of voice, kind of conversation that

10    may be occurring, things like that -- if those have you

11    believe, in your view, that they change the analysis the Court

12    should apply to this situation, you should bring that back to

13    me, and I would certainly look at the videos myself.

14          MR. OKSENHENDLER:  Yes, your Honor.

15          THE COURT:  I will tell you that the third video

16    alone, in my view, probably would have been sufficient for me

17    to have detained the defendant, had I been hearing this

18    application in the initial instance.  To have that kind of

19    standing up, and punching, and with an audiotape, a clear

20    enforcement of this kind of violent enterprise, that is

21    extremely troubling to me.  However, I have not seen the

22    videos.  I'm just suggesting that if all we have was that one,

23    that would have been sufficient for the Court, under these

24    circumstances, given the nature of the case.

25          In terms of risk of flight, I also find that there is,

H69KKHUC

frankly, in my view, clear and convincing evidence of risk of

flight.  I think we only need to get to a preponderance, but I

think it's quite clear and convincing.  With somebody who is

accused of a serious crime where there is audio surveillance,

video surveillance, firsthand observation testimony, the

strength of the evidence is quite clear.  The motivation to

flee is very high.  Indeed, the motivation to flee when your

career is a time-bound career makes it all the more urgent to

flee.  And what I mean by that is if you are any kind of

athlete, the longer you are out of play, so to speak, the more

difficult it is.

     So, the motivation to flee is very high, the impact on

the career is very significant, and the need to travel for that

career provides an additional motivation.  Also, the defendant

is potentially facing, if the government is able to carry its

burden of proof, a lengthy period of incarceration, which also

carries a motivation for flight.

     In addition to that, there are no real ties to the

community in a familial sense, although I accept that

Mr. Oksenhendler has indicated that there may be individuals

who function as a second family.  If, again, there is a

sufficient factual predicate to sort of bring evidence forward

in that regard, that the defendant really has some down ties in

this country in terms of second family, that would be of

significance to the Court's reevaluation of its determination

H69KKHUC

1   as to risk of flight.

2          However, he doesn't have a fixed address.  He'd be

3   living in a hotel.  He travels overseas with frequency and for

4   extended periods of time.  He has significant foreign ties.

5   His whole family is over there.  He's only here on a visa and

6   not a green card, and he has ample means to finance a flight.

7          In addition to that, he also has, conceivably, ways in

8   which he could access the means for flight, meaning the

9   appropriate identification documentation, despite the fact that

10  he's had to relinquish his passport.  I note that the Court did

11  hear a lengthy description of the government's case earlier

12  this afternoon, which described at length the amount of

13  equipment that was involved in false identification, false IDs.

14  The idea that he would be able to get the necessary

15  identification documentation together to fly to one location,

16  to fly to another location, or to fly to another location

17  directly is certainly something that is well within the realm

18  of possibility.

19         The Court then turns, having found risk of flight by

20  preponderance of the evidence, but here by clear and

21  convincing, since I found clear and convincing -- I have no

22  trouble finding clear and convincing -- that there are no

23  conditions, or set of conditions, or combination of conditions

24  which could guarantee or reasonably assure -- not guarantee,

25  strike that word -- but reasonably assure the appearance of the

H69KKHUC

1    defendant.  I say that because there, again, is no home or

2    assets to restrain here in the United States of any

3    significance.  The assets that would be restrained would be

4    overseas.  There's no real place that I'm aware of at this

5    point in time that would be an appropriate place for additional

6    surveillance, and, as we all know, things like ankle monitors

7    can be cut off, and if you've got the means to flee, then

8    that -- as I suggested I think the defendant has -- a home

9    monitoring, in and of itself, strict pretrial supervision,

10   doesn't do it.

11         So, I find that there is both a sufficient showing of

12   a risk of flight and a lack of conditions which would

13   reasonably assure the appearance of the defendant, as well as a

14   danger to the community.

15         As a result, I reverse the bail determination of

16   Magistrate Judge Gorenstein.

17         I also note, however, that as the government said it

18   did provide additional evidence today, while it didn't rely on

19   certain arguments, it brought forward additional material upon

20   which the Court is relying.  And I also had the benefit of a

21   very lengthy, almost a 45-minute, recitation of the government

22   evidence in this case and the nature of the enterprise overall.

23   So, I believe that the presentation made to me was an extremely

24   full presentation, which described the nature of this

25   enterprise and all of the evidence in connection with the

1   discovery presentation that will be presented to prove up the

2   government's case.

3          So, the government can and is entitled to rely upon a

4   factual proffer.  It has done so here.  The Court does not have

5   the benefit of having evaluated the evidence here.  And I do,

6   as always, invite additional development of the factual record.

7   If Mr. Oksenhendler would like to present me with materials, I

8   will make a bail application a priority, and you can bring it

9   to me, and I'll hear yet a renewal.  You can make another one

10  next week, and I will hear it.  But at this time, I do revoke

11  the terms of bail that have been set.  The defendant will be,

12  and remain, remanded to the custody of the United States

13  Marshals unless and until that determination is changed.

14         I've signed the order of remand -- the bail

15  revocation, I should say, not remand.  He's already currently

16  in custody.

17         Is there anything else we should do today?

18         One more thing.  I'm not going to put out a written

19  factual determination of this.  Under the rules, it is

20  sufficient that the transcript of this proceeding constitute

21  the findings of fact of this Court, and the transcript of this

22  proceeding shall constitute the findings of fact of this Court,

23  so I'm not planning on putting out a separate written decision.

24         Therefore, counsel on any appeal can rely upon the

25  transcript, and if you plan on appealing, Mr. Oksenhendler, you

H69KKHUC

1    can apply to get a copy of the transcript, and I would

2    certainly sign for that, since you're CJA.  I would note that,

3    given the defendant's assets, there is a significant question

4    as to whether he meets the qualifications for being CJA, having

5    counsel appointed for him, and it may be that that needs to be

6    revisited.  However, in connection with his bail application,

7    we should not dillydally on that or let that hold us up.  I'm

8    certainly willing to sign CJA vouchers for purposes of a

9    renewed bail application in the short-term.  I'm just

10   suggesting that the CJA position of counsel should be

11   reevaluated in the longer term.

12            Thanks, folks.  We're adjourned.

13                          *  *  *

14

15

16

17

18

19

20

21

22

23

24

25